Lauren M. Rule (OSB #015174)
ADVOCATES FOR THE WEST
3115 NE Sandy Blvd., Ste. 223
Portland, OR 97232
(503) 914-6388
lrule@advocateswest.org

David H. Becker (OSB # 081507)
Law Office of David H. Becker, LLC
833 SE Main Street, #302
Portland, OR 97214
davebeckerlaw@gmail.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### MEDFORD DIVISION

| | |
|---|---|
| **OREGON WILD**, an Oregon non-profit corporation, **FRIENDS OF LIVING OREGON WATERS**, an Oregon non-profit corporation, and **WESTERN WATERSHEDS PROJECT**, an Idaho non-profit corporation, | **Case No**. 15-cv-895 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | **(Environmental Matter – Wild and Scenic Rivers Act, National Forest Management Act, Clean Water Act, Endangered Species Act, Administrative Procedure Act)** |
| **U.S. FOREST SERVICE**, a federal agency, and **U.S. FISH & WILDLIFE SERVICE**, a federal agency, | |
| Defendants. | |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    Plaintiffs Oregon Wild, Friends of Living Oregon Waters, and Western Watersheds Project (collectively, "Plaintiffs") challenge the U.S. Forest Service's ("Forest Service") authorizations to graze certain federal cattle allotments on the Paisley and Bly Ranger Districts of the Fremont-Winema National Forest for violating the Wild and Scenic Rivers Act ("WSRA"), National Forest Management Act ("NFMA"), and Clean Water Act ("CWA"). Plaintiffs also challenge the Endangered Species Act ("ESA") consultation conducted by the Forest Service and U.S. Fish and Wildlife Service ("FWS") over impacts of continued livestock grazing on bull trout critical habitat within the Fremont-Winema National Forest for being arbitrary, capricious and otherwise not in accordance with the ESA, in violation of the Administrative Procedure Act ("APA").

2.    The grazing decisions challenged in this case pertain to Forest Service allotments in the upper Sycan and upper Sprague River watersheds within the upper Klamath Basin of south-central Oregon.  The upper Sycan River is a designated Wild and Scenic River, recognized for its outstanding scenic and fisheries values.  The Sycan River begins as a small spring, which then winds its way downstream through several miles of large, open meadows before plunging into a scenic canyon.  The Hanan Trail, popular with recreational hikers and horseback riders, follows this upper portion of the Sycan River for several miles.  The Forest Service has failed to protect the outstandingly remarkable values of this river, and the public's use and enjoyment of it, by authorizing cattle to graze in the adjacent meadows.  This grazing is causing severe degradation of the stream channel and adjacent riparian areas, impairing fish habitat as well as the scenic value of the area, in violation of the WSRA as well as the Forest Service's own management plan for the river.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 1

3.      The Forest Service has also authorized grazing in the upper Sprague River watershed with similar results.  Grazing in these watersheds has caused overwidened stream channels with little to no overhanging vegetation or undercut banks, leading to warm water temperatures.  Many streams within Forest Service grazing allotments in these watersheds violate state water quality standards and Forest Plan objectives for water temperature.  By continuing to authorize grazing that is contributing to these violations, the Forest Service is violating its duty to ensure compliance with the CWA and NFMA.

4.      Water temperature exceedances are particularly concerning because these watersheds provide habitat for small, isolated populations of the fragile Klamath River bull trout, an ESA threatened species.  The upper Sycan and upper Sprague watersheds contain two of the three core areas for Klamath River bull trout, and each of the two has dramatically declined in number of populations and distribution of the species.  The few remaining populations of these fish in the Klamath Basin can only survive in streams with cool water temperatures, sufficient riparian and instream cover, and clean spawning gravels.

5.      Despite the damage that grazing has caused to streams and bull trout habitat in these two watersheds, the Forest Service and FWS determined in 2011 that the same grazing could continue to occur because it was not likely to adversely affect bull trout critical habitat— habitat FWS concluded is essential for recovery of the species.

6.      The agencies' "not likely to adversely affect" determination, as documented in the Forest Service's supplemental biological assessment and FWS' two-page letter of concurrence, was flawed for many reasons.  The agencies' conclusions about effects of grazing were not supported by data or rational explanations, did not adequately consider impacts of other activities occurring in the same watersheds, failed to consider important aspects of and impacts to bull

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 2

trout habitat, and were based on inaccurate and incomplete information.  The determination also relied on a monitoring scheme that would allegedly ensure future grazing would not cause any adverse effects even though multiple critical habitat streams within the allotments would not be monitored at all, and the Forest Service's track record shows the planned monitoring is not certain to occur or certain to protect bull trout habitat.  Due to these legal flaws, the supplemental biological assessment and letter of concurrence were arbitrary, capricious and contrary to the ESA, in violation of the APA.

7.    The Forest Service's continuing authorization of grazing in the upper Sycan and upper Sprague watersheds is violating the WSRA, NFMA and CWA.  In addition, the Forest Service and FWS' consultation over impacts of grazing on bull trout critical habitat in this same area is arbitrary and capricious.  Accordingly, this action requests that the Court issue declaratory and injunctive relief to remedy these violations of law.

## JURISDICTION

8.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, including WSRA, 16 U.S.C. § 1271 *et seq.*, NFMA, 16 U.S.C. § 1600 *et seq.*, the CWA, 33 U.S.C. § 1251 *et seq.*, the ESA, 16 U.S.C. § 1531 *et seq.*, APA, 5 U.S.C. § 701 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*  An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

9.    Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, two of the Plaintiffs and both Defendants reside in this district, and the public lands and

resources at issue are located in this district.

10.    The federal government waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

11.    Plaintiff OREGON WILD is an Oregon non-profit organization with approximately 10,000 members and supporters throughout the state of Oregon and the Pacific Northwest.  Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy.  Oregon Wild members regularly use the Sycan and Sprague River watersheds on the Fremont-Winema National Forest for recreational, scientific, aesthetic and other purposes, and will continue to visit these areas in the future.  Oregon Wild has participated in management decisions concerning livestock grazing allotments in these watersheds and sought protections for species and habitat there, and will continue to do so in the future.  Livestock grazing in these watersheds that degrades species and habitat and conflicts with recreational, scientific, and aesthetic use impairs the use and enjoyment of the area by Oregon Wild members.

12.    Plaintiff FRIENDS OF LIVING OREGON WATERS ("FLOW") is an Oregon non-profit public interest organization advocating for the protection and restoration of Oregon's waters.  FLOW's mission is to help protect Oregon's rivers, watersheds, lakes, wetlands, and groundwater from the impacts of pollution and development, including the water quality degradation associated with livestock grazing.  Headquartered in Grants Pass, Oregon, FLOW provides legal oversight of land uses affecting waters throughout the state, and educates the public on these issues.  FLOW members use and enjoy the waters of the Sycan and North Fork Sprague Rivers for recreational, aesthetic, and education purposes, and will continue to visit

these areas in the future.  FLOW has participated in management decisions concerning livestock grazing allotments in these watersheds and sought protections for species, habitat, and water quality, and will continue to do so in the future.  Livestock grazing in these watersheds that degrades water quality and habitat and conflicts with recreational, aesthetic, and educational use impairs the use and enjoyment of the area by FLOW members.

13.      Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a non-profit organization headquartered in Idaho, with offices and staff in Idaho, Arizona, California, Oregon, and Wyoming.  WWP is dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West.  WWP, as an organization and on behalf of its 1,200-plus members, is concerned with and active in seeking to protect and improve the wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West, including south-central Oregon.  WWP staff and members use the Sycan and Sprague watersheds for recreation, scientific study, and aesthetic purposes, and will continue to do so in the future.  WWP is active – and will continue to be active – in monitoring ecological conditions within these watersheds, and in publicizing the adverse ecological effects of grazing in this area.  Livestock grazing in these watersheds that degrades the species and habitat and conflicts with recreational, aesthetic, and scientific use impairs the use and enjoyment of the area by WWP members.

14.      Plaintiffs' interests have been and will continue to be directly harmed by Defendants' actions as challenged herein.  Plaintiffs and their members have participated in relevant administrative actions and the public processes authorizing livestock grazing in these watersheds.  Plaintiffs' members and supporters also visit these watersheds, and their use and enjoyment of these areas has been impaired by livestock grazing authorized by the Forest

Service.  Unless the relief prayed for herein is granted, Plaintiffs and the public will continue to suffer adverse and irreparable injury to their interests.

15.    Defendant U.S. FOREST SERVICE is an agency or instrumentality of the United States, under the U.S. Department of Agriculture, and is statutorily charged with managing the National Forest lands at issue here.  The Forest Service issued the grazing authorizations, as well as the bull trout biological assessment, that are challenged in this action.

16.    Defendant U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States, under the U.S. Department of the Interior.  FWS is responsible for administering the provisions of the ESA with regard to threatened and endangered species, including bull trout.  FWS issued the letter of concurrence that is challenged in this action.

## STATEMENT OF LAW

### Wild and Scenic Rivers Act

17.    In 1968, Congress enacted the WSRA to preserve certain rivers with outstanding scenic, recreational, fish and wildlife, and other values for the enjoyment of present and future generations.  16 U.S.C. § 1271.

18.    The WSRA requires agencies to administer designated rivers to "protect and enhance" the values that caused the river to be designated.  16 U.S.C. § 1281(a).  Other uses of the river can be limited if they are inconsistent with protecting and enhancing the values of the river or substantially interfere with public use and enjoyment of the values.  *Id*.  Primary emphasis is to be given to protecting aesthetic and scenic features, among others.  *Id*.  The WSRA also imposes the mandatory duty that the Forest Service "shall take such action respecting management policies, regulations, contracts, plans, affecting such rivers . . . as may be necessary to protect such rivers in accordance with the purposes of this Act."  *Id*. § 1283(a).  The

WSRA requires federal agencies charged with administering designated rivers to prepare a comprehensive management plan to provide for the protection of the river values. *Id*. § 1274(d).

19.     The Sycan River within the Fremont-Winema National Forest was designated as a Wild and Scenic River in 1988. *Id*. § 1274(a)(103). [1]

20.     The Forest Service issued a Management Plan and accompanying Monitoring Plan for the Sycan River in 1992. The Management and Monitoring plans were incorporated into the Fremont Forest Plan that same year. The Sycan River Management Plan governs the Forest Service's administration of the Wild and Scenic River corridor.

21.     The goals and desired conditions in the Management Plan emphasize protection and enhancement of the river's scenic, wildlife, recreational, and fisheries values. The Plan allows the Forest Service to provide opportunities for livestock grazing only "when it is consistent" with those and other river values. The Plan prioritizes achievement of water quality standards.

22.     The Plan contains standards and guidelines to protect and enhance the identified river values, including:

> a.  For Riparian Areas (Management Plan at 8-9):
>
>> i.  In cases of unresolved conflict, soil, fish, water, and wildlife shall receive preferential consideration.
>>
>> ii.  Livestock grazing in the river corridor shall be managed to ensure that, where streambanks or channels are highly erodible, grazing would occur only where it would not have destabilizing effect on the streambank.

---

[1] The North Fork Sprague has also been designated as a Wild and Scenic River, but Plaintiffs do not focus on that designation for purposes of this complaint.

      iii. No increase over natural levels of streambank degradation (existing at the time of Wild and Scenic designation) shall be caused or perpetuated by livestock.

b. For Scenic Resources (Management Plan at 10-11):

      i. Within the foreground retention area, maintenance of all native tree, shrub, grass, and riparian vegetation communities shall be emphasized.

c. For Fisheries Resources (Management Plan at 14-15)

      i. Water temperatures: third order streams or lower should have temperatures of 55 degrees Fahrenheit (12.7 degrees Celsius) or less; fourth order streams or higher should have temperatures of 58 degrees Fahrenheit (14.4 degrees Celsius) or less.

      ii. Stream canopy closure: perennial streams (class I, II, and III) should have 80% shade cover of the stream surface area, or 100% of site potential.

      iii. Pool habitat: if the stream gradient is 1.5% or less, then 50% or more of the stream should be pool habitat. If the stream gradient is 1.5-3%, then 40% or more of the stream surface area should be pool habitat. If the stream gradient is greater than 3%, then 30% or more of the stream surface area should be pool habitat.

      iv. Bankfull width-to-depth ratio: unconstrained valley floors should have a ratio of 10 to 1, or less. Constrained valley floors should have a ratio of 7 to 1, or less.

d. For Proposed, Endangered, Threatened, or Sensitive Species (Management

Plan at 15-16, citing to Forest Plan):

    i.   For endangered, threatened, and sensitive species, maintain or increase the status of populations and habitats, implement the strategies prepared for protection.

23.    The Management Plan also outlines specific management actions for livestock grazing within riparian areas, stating that "[l]ivestock access to streams should be restricted or prohibited in order to protect trees and shrubs.  Partial or full exclosure shall be provided in identified grazing/browsing problem areas."  Management Plan at 18.

24.    The Forest Service also issued a Monitoring Plan outlining monitoring objectives for water quality and fisheries management, as well as management of proposed, threatened, endangered, and sensitive species.  These included the objective to conduct habitat inventories on all fish-bearing streams in the Sycan River watershed at five-year intervals, as well as on perennial, non-fish-bearing streams which represent other upper watershed streams at ten-year intervals.  The Monitoring Plan also directed the Forest Service to conduct annual assessments of habitat protection for sensitive species, and to determine and monitor densities of sensitive species every five years.

**Clean Water Act**

25.    The CWA, 33 U.S.C. § 1251 *et seq*., was enacted "to restore and maintain the chemical, physical, and biological integrity of the nation's waters."  33 U.S.C. § 1251(a).

26.    The CWA requires the creation of water quality standards, which are developed by the states.  *Id*. § 1313(c).  The standards created by the states are subject to review and approval by the U.S. Environmental Protection Agency ("EPA").  *Id*. §§ 1313(a) and (c).

27.    States are responsible for developing water quality standards to protect the desired

conditions of each waterway within the state's regulatory jurisdiction. *Id*. § 1313(c). A water

quality standard is comprised of multiple elements, including designated use(s) of the regulated

waters, such as fish and aquatic life, and numeric and narrative criteria specifying the water

quality condition necessary to protect the designated uses. *Id*. § 1313(c)(2); 40 C.F.R. §§ 131.6,

131.10-12.

28.     States are also required to develop lists of waters where required pollution

controls are insufficient to attain or maintain applicable water quality standards. *Id*. §

1313(d)(1)(A). States must establish a total maximum daily load ("TMDL") for the pollutants

impairing the waters identified pursuant to section 1313(d)(1)(A). *Id*. § 1313(d)(1)(C); 40 C.F.R.

130.7(b) and (c). A TMDL establishes the maximum load and wasteload allocations of the

pollutant(s) at issue. 40 C.F.R. § 130.2(i).

29.     The CWA also requires all federal agencies with "jurisdiction over any property

or facility" or "engaged in any activity resulting, or which may result, in the discharge or runoff

of pollutants" to comply with water quality standards. *Id*. § 1323(a). Under Section 1323(a),

Federal agencies must ensure that any authorized activity on federal lands complies with all

applicable water quality standards.

30.     Oregon Administrative Rules ("OAR") specify the numeric water temperature

standard for surface waters of the state, depending on designated beneficial use. OAR 340-041-

0028(4). The seven-day-average maximum temperature of a stream identified as having

Lahontan cutthroat trout or redband trout use on applicable OAR maps or tables may not exceed

20°C. OAR 340-041-0028(4)(e). This limit corresponds to 68°F. The seven-day-average

maximum temperature of a stream identified as having bull trout spawning and juvenile rearing

use on applicable OAR maps may not exceed 12°C. OAR 340-041-0028(4)(f). This limit

corresponds to 53.6°F.

31.    The State has designated uses and criteria specific to the Klamath Basin.  OAR 340-041-0180; Figure 180A: Fish Use Designations, Klamath Basin, Oregon.  Most streams in the Upper Sycan and Upper Sprague River watersheds are designated as either bull trout spawning and rearing or Lahontan/redband trout use.  *Id.*

32.    The OARs also specify standards for other pollutants such as *E. coli* (OAR 340-041-0009), biocriteria (OAR 340-041-0011), dissolved oxygen (OAR 340-041-0016), pH (OAR 340-041-0021), and turbidity (OAR 340-041-0036).

33.    In response to a lawsuit, in August 2013, DEQ removed former OAR 340-041-0061(12), a provision from its water quality regulations that stated "water quality standards are expected to be met through the development and implementation of water quality restoration plans, best management practices, and aquatic conservation strategies.  Where the department designates a federal agency as a designated management agency, implementation of these plans, practices, and strategies is deemed compliance with this division."  At that time, DEQ also removed former OAR 340-041-0028(12)(g), a similar provision within its temperature regulation.  The current DEQ regulations do not contain any provision that states compliance with water quality restoration plans and best management practices constitutes compliance with water quality standards.

**National Forest Management Act**

34.    Congress enacted NFMA, 16 U.S.C. § 1600 *et seq*. in 1976 to govern the Forest Service's management of the National Forests.  NFMA establishes a two-step process for forest planning and management.  First, it requires the Forest Service to develop, maintain, and revise Land and Resource Management Plans ("Forest Plan") for each national forest.  16 U.S.C. §

1604(a).  The Forest Plan guides natural resource management activities forest-wide, setting standards, management goals and objectives, and monitoring and evaluation requirements.

35.     Second, once a Forest Plan is in place, site-specific actions are planned and evaluated by the Forest Service.  All site-specific decisions must be consistent with the broader Forest Plan.  *Id.* § 1604(i); 36 C.F.R. § 219.15.

36.     The Fremont Forest Plan was adopted in 1989.  The Forest Plan established goals, objectives, standards, and guidelines for Forest Service actions and authorizations.

37.     The Forest Plan prioritizes protection and improvement of water quality, channel stability, fisheries, and riparian areas, particularly trout habitat.

38.     The Forest Plan contains goals, standards and guidelines directing the management of fish habitat and water quality, including water temperature, and giving soil, fish, water and wildlife preferential consideration in cases of unresolvable conflict.  Fremont Forest Plan at 103-09, 199-204.  The Plan also requires compliance with all applicable state and federal water quality standards.  Fremont Forest Plan at 86, 199.

39.     The Plan was amended in 1995 to incorporate the Inland Native Fish Strategy ("INFISH") standards and guidance with respect to riparian resource and fisheries protections. INFISH sets goals to maintain and restore water quality to the degree necessary to provide stable and productive riparian and aquatic ecosystems, stream channel integrity, and riparian and aquatic habitats to support native fish populations.

40.     For water temperature, INFISH requires that the Forest Service's grazing authorizations not cause a measurable increase in maximum water temperature, which is defined as a 7-day moving average of daily maximum temperature measured as the average of the maximum daily temperature of the warmest consecutive 7-day period.

41.     INFISH establishes temperature objectives of "no measurable increase in maximum temperature," and maximum water temperatures "below 59 [degrees Fahrenheit] within adult holding habitat and below 48 [degrees Fahrenheit] within spawning and rearing habitats."

42.     INFISH also establishes other riparian management objectives ("RMO") for pool frequency, large woody debris, bank stability, lower bank angle, and width-to-depth ratio.

43.     The Forest Plan emphasizes protection of the Wild and Scenic river qualities of the Sycan River.  The Forest Plan was amended in 1992 to incorporate the Sycan Wild and Scenic River Management Plan.

**Endangered Species Act**

44.     The ESA was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such [] species."  16 U.S.C. § 1532(b).

45.     Under the ESA, the Secretary of the Interior or Commerce ("the Secretary") lists a species as endangered if it is "in danger of extinction throughout all or a significant portion of its range," or as threatened if it is "likely to become an endangered species within the foreseeable future."  16 U.S.C. §§ 1533(a)(1), 1532(6) & (20).

46.     Concurrently with listing a species as threatened or endangered, the Secretary also must designate the species' "critical habitat."  16 U.S.C. § 1533(a)(3).  Critical habitat is the area that contains the physical or biological features essential to the conservation of the species and which may require special protection or management considerations.  *Id*. § 1532(5)(A).  "Conservation" means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to

this Act are no longer necessary"—i.e. the species is recovered.  *Id*. at §1532(3).  The essential

physical and biological features, called primary constituent elements ("PCE"), include but are

not limited to physical space; food, water, air, light, and minerals; cover or shelter; sites for

breeding, reproduction, and rearing of offspring; and protected habitats.  *Id*. § 1532(5)(A); 50

C.F.R. § 424.12(b).

47.    Under ESA § 7(a)(2), all federal agencies must "insure that any action authorized,

funded or carried out by such agency . . . is not likely to jeopardize the continued existence of

any endangered or threatened species or result in the destruction or adverse modification of

[designated critical] habitat."  16 U.S.C. § 1536(a)(2).

48.    If a proposed action "may affect" a listed species or its critical habitat, the action

agency must consult with NOAA Fisheries or FWS.  16 U.S.C. § 1536(a)(2); 50 C.F.R. §

402.14(a).  FWS will be used hereafter, as it is the agency responsible for inland fish species

such as bull trout.  *See* 50 C.F.R. § 402.01.  To fulfill its Section 7(a)(2) mandate, the action

agency prepares a biological assessment ("BA") to evaluate the potential "effects of the action"

on listed species and critical habitat and determine whether a species or its habitat is "likely to be

adversely affected" ("LAA") or "not likely to be adversely affected" ("NLAA") by the action.

*Id*. § 402.12.

49.    Effects of the action refers to "the direct and indirect effects of an action on the

species or critical habitat, together with the effects of other activities that are interrelated or

interdependent with that action, that will be added to the environmental baseline."  50 C.F.R. §

402.02.  The environmental baseline "includes the past and present impacts of all Federal, State,

or private actions and other human activities in the action area, the anticipated impacts of all

proposed Federal projects in the action area that have already undergone [] section 7

consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id*. Cumulative effects are the effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area. *Id*.

50.    For LAA actions, the action agency must seek "formal" consultation with FWS, which concludes with the FWS issuing a Biological Opinion. 50 C.F.R. § 402.14(a). For NLAA actions, the action agency may seek "informal" consultation with FWS. *See id*. § 402.14(b).

51.    Informal consultation concludes with a Letter of Concurrence from FWS and is only appropriate when the BA or other information indicates that the action has no likelihood of adverse effect to the listed species or designated critical habitat. *See id*. § 402.13(a).

**Administrative Procedure Act**

52.    The APA confers a right of judicial review on any person that is adversely affected by a federal agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

## STATEMENT OF FACTS

## I.    Area of Interest and Special Resources

### A.    General Description of the Area

53.    The Sprague and Sycan rivers are located in the Sprague River Basin, part of the upper Klamath River Basin in south-central Oregon. The Sprague River Basin is a high, semi-arid basin in the rain shadow of the Cascade Range. Higher elevations within this basin contain mixed conifer forests interspersed with broad stream meadows. Lower elevations are more desert-like, with vegetation such as sagebrush predominating.

54.     The North Fork and South Fork of the Sprague River both begin on the north-eastern side of the Basin, in or near the Gearhart Mountain Wilderness and the 8,364-foot-high Gearhart Mountain.  These two streams flow generally north or southwest out of the wilderness before joining together to form the Sprague River, which is a tributary to the Williamson River and Upper Klamath Lake.  The Sycan River begins at a spring in a large meadow just northeast of Gearhart Mountain.  From its headwaters, the Sycan River flows north and west into the Sycan Marsh and eventually into the Sprague River.

55.     Mean annual precipitation within the Sprague Basin ranges from less than 40 centimeters (about 15 inches) in the valley floors to 120 centimeters (about 47 inches) at the high altitude basin margins.  Historically, precipitation generally fell as snow, particularly at higher elevations.  However, this part of the upper Klamath Basin has been affected by prolonged, deepening drought over the last four years.  The State of Oregon has declared annual drought emergencies in Klamath County since 2012, and in Lake County since at least 2013.

**B.     The Wild and Scenic Sycan River**

56.     As stated above, in 1988, Congress designated fifty-nine miles of the Sycan River – from its headwaters downstream – as a Wild and Scenic River, to protect its outstanding scenic, geologic, fisheries, and wildlife values.  50.4 miles of the Sycan River are designated "scenic" and 8.6 miles are designated "recreational."

57.     The upper segment of the river, which is designated as "scenic," flows through the Fremont-Winema National Forest.  The Forest Service is the federal river-administering agency for this segment of the Sycan River.

58.     From its headwaters, the upper Sycan River winds through a series of large, open meadows surrounded by lodgepole pine, with interspersed aspen.  At the time of designation,

these meadows provided a significant amount of riparian habitat and a diversity of vegetation, including water-related riparian vegetation.  In its 1991 Sycan River Resource Assessment, the Forest Service noted that the type and extent of these meadows and riparian areas is unique within the region, and concluded that they provided outstandingly remarkable scenic value.

59.    The Forest Service also specifically recognized the fisheries values of this upper segment of the river.  Several trout species, including bull trout, redband trout, brook trout, and brown trout have been known to inhabit this portion of the river.  Bull trout are thought to have been extirpated from the upper Sycan since the 1970s, and redband trout are currently known to exist only in two tributaries to the upper Sycan.  In contrast, the Sycan currently has an extensive, self-sustaining population of brook trout, a non-native, warm-water species.

60.    The Forest Service's 1991 Resource Assessment noted that water quality and habitat conditions in the upper segment were "much better" than the downstream segments, and that streambank stability was "generally good," with areas of erosion and high sediment only found in the lower reaches.  Livestock grazing had resulted in some impacts to the lower reaches of this segment, including channel widening and modification of riparian vegetation that led to increased stream temperatures.

61.    The upper Sycan River is a noted destination for hikers and fishing enthusiasts. The Forest Service has established and maintains an historic trail, the Hanan Trail, along this upper segment.  The trail largely parallels the river and at times runs adjacent to it.  The trail accesses the Hanan Roadless Area, several meadows along the river, and the river's headwaters.

C.    **Bull Trout in the Upper Sprague and Upper Sycan Watersheds**

Status and Distribution

62.    The Klamath River Basin contains a distinct population segment ("DPS") of bull

trout.  FWS listed the Klamath River bull trout DPS as "threatened" under the ESA in 1998.

Klamath River bull trout are physically separated from other bull trout and thus, they are

reproductively isolated and evolutionarily and genetically distinct from other bull trout.  Reasons

for bull trout decline in the Klamath basin include habitat degradation and fragmentation due to

land and water management practices, including livestock grazing.

63.     Currently, Klamath River bull trout only occur in isolated populations found in

select high elevation headwater streams.  FWS' 2002 draft recovery plan for the Klamath River

bull trout DPS noted that only twelve local populations exist within three core areas: three

populations within the Upper Klamath Lake core area, two within the Sycan River core area

(Long Creek and Coyote Creek), and seven within the Upper Sprague core area (North Fork

Sprague River and Boulder, Dixon, Brownsworth, Deming, Leonard, and Sheepy Creeks).  In

2002, FWS determined that in order to achieve recovery, three to five new populations would

need to be established in each of the Sycan and Upper Sprague River core areas.

64.     In 2008, FWS reviewed the status of Klamath River bull trout.  FWS determined

that Sycan River and Upper Sprague River core areas both face imminent threats, with the Upper

Sprague River core area at risk of extirpation and Sycan River at high risk of extirpation.

Subsequent studies, including FWS' 2014 draft revised recovery plan, have found that now just

one population exists in the Sycan core area and five in the Upper Sprague core area.

65.     FWS stated that the Klamath Recovery Unit is the least robust, most vulnerable,

and most significantly imperiled bull trout recovery unit due to the extirpation of nine of

seventeen known populations and the geographic contraction of existing populations.  FWS

determined that bull trout geographic distribution within this unit must be substantially expanded

before it can be considered recovered.

66.     Threats to all three core areas include connectivity impairment, small population size, and instream impacts such as low flows, high water temperature, and high sedimentation. If habitat conditions improve in the Upper Sycan, North Fork and South Fork Sprague Rivers, those rivers would provide suitable migratory corridors to connect bull trout moving from occupied tributaries downstream to unoccupied spawning and rearing tributaries upstream, improving distribution and connectivity of populations.

<u>Designation of Critical Habitat</u>

67.     In 2005, FWS designated critical habitat for the Klamath River bull trout DPS. This designation exempted areas subject to Federal management plans and did not include any unoccupied habitat.  The designation was challenged in federal court in 2006.  In 2009, FWS sought voluntary remand of the 2005 final rule and the court granted that request, directing publication of a new proposed rule by the end of the year, with a final to follow.

68.     On October 18, 2010, FWS finalized its revised designation of critical habitat for bull trout in the coterminous U.S., including the Klamath River DPS.  This designation became effective November 17, 2010.  The revised designation no longer exempted lands subject to federal management plans, and included a substantial amount of unoccupied habitat outside of the geographic area occupied by the species at the time of listing that FWS determined to be essential for bull trout recovery.  In the Klamath Basin, FWS designated a substantial proportion of unoccupied habitat in order to restore connectivity among isolated headwater bull trout populations by protecting foraging, migration, and overwintering habitat.

69.     The final rule designated over 276 miles of occupied and unoccupied streams in the Klamath River Basin critical habitat unit.  The amount of designated critical habitat within the vicinity of federal grazing allotments in the upper Sprague and upper Sycan watersheds

increased ten-fold.  Streams with newly designated critical habitat within these watersheds

included the North Fork Sprague River, South Fork Sprague River, and Sycan River, as well as

several streams within the headwater watersheds of those rivers, such as Dead Cow, Camp,

Corral, Gold, School, Boulder, and Rifle creeks, and South Fork Sycan River.

70.     In the 2010 critical habitat designation, FWS determined the primary constituent

elements (PCEs) that are essential for bull trout conservation: (1) springs, seeps, and

groundwater sources to contribute to water quality and quantity and provide thermal refugia; (2)

migration habitats with minimal physical, biological, or water quality impediments between

spawning, rearing, overwintering, and foraging habitats; (3) an abundant food base; (4) complex

river and stream aquatic environments, and processes that establish and maintain these

environments, with features such as pools, undercut banks, and unembedded substrates; (5) water

temperatures ranging from 2 to 15°C (36 to 59°F), with adequate thermal refugia for

temperatures exceeding the upper end of this range; (6) a minimal amount of fine sediment

embedded in larger substrates in spawning and rearing areas; (7) a natural hydrograph or

minimal departure from a natural hydrograph; (8) sufficient water quality and quantity such that

normal reproduction, growth, and survival are not inhibited; and (9) sufficiently low levels of

occurrence of nonnative predatory, interbreeding, or competing species such as brook and brown

trout.

**D.     Water Quality Problems in the Upper Sprague and Sycan Watersheds**

71.     Over recent decades, streams in the upper Sprague and upper Sycan watersheds

have consistently had high summer water temperatures.  Based on violations of historical state

water temperatures standards, in 1998 Oregon DEQ placed several streams in these watersheds

on the 303(d) list of impaired streams for water temperature.  These streams include large

stretches of the North Fork Sprague, South Fork Sprague, and Sycan rivers, as well as tributaries to those streams within headwater drainages, such as Boulder Creek, Coyote Creek, Paradise Creek, and Pothole Creek.

72.     The South Fork Sprague River is on the 303(d) list of impaired streams for *E. coli*.

73.     An EPA assessment for the 2006 reporting year indicated that several streams within the upper Sprague and upper Sycan watersheds remained in violation of applicable water temperature standards, including Boulder Creek, Coyote Creek, Paradise Creek, Pothole Creek, North Fork Sprague River, South Fork Sprague River, and Sycan River.

74.     The EPA assessment also indicated that streams within these watersheds were not meeting the applicable water quality standards for nutrients – eutrophication and/or sediment. For instance, the North and South Fork Sprague and Sycan rivers were considered impaired for nutrients – eutrophication.  This assessment also indicated that the North Fork Sprague River was not meeting the applicable standard for pH.

## II.    Livestock Grazing Management and Impacts

### A.    Federal Grazing Allotments Containing Special Resources

75.     The Fremont-Winema National Forest manages several federal livestock grazing allotments within the upper Sprague and upper Sycan watersheds.  At least ten of those allotments contain sections of the designated Wild and Scenic Sycan River and/or designated critical habitat for bull trout: Bear Lakes, Withers Special Use, Currier Camp, Sycan, Riverbeds, Foster Butte, Paradise Creek, Meryl Creek, Yaden Flat, and Pothole allotments.

76.     In the upper Sycan River watershed, federal grazing allotments, including the Bear Lakes, Withers Special Use, and Currier Camp allotments, contain stretches of the upper

segment of the Wild and Scenic Sycan River.  These allotments also contain designated critical habitat for bull trout in the Sycan River itself, South Fork Sycan, Boulder Creek, and Rifle Creek, as well as multiple perennial and intermittent tributaries to critical habitat, such as Skull, Paradise, Crazy and Watson creeks, and several unnamed tributaries.

77.    In the North Fork Sprague River watershed, federal grazing allotments, including the Paradise Creek and Bear Lakes allotments, contain designated critical habitat for bull trout in the North Fork Sprague River itself, as well as Dead Cow, Gold, and School creeks.  These allotments also contain multiple perennial and intermittent tributaries to critical habitat such as Cold Creek and several unnamed tributaries.

78.    In the South Fork Sprague River watershed, the Pothole federal grazing allotment contains designated critical habitat for bull trout in the South Fork Sprague River itself, as well as Camp and Corral creeks.  This allotment also contains multiple perennial and intermittent tributaries to critical habitat such as Whitworth, Pothole, and Buckboard creeks.

79.    The federal grazing allotments described above are typically grazed annually. Permitted or authorized numbers of cattle vary by allotment, but generally range from thirty to more than one thousand cow/calf pairs per allotment.  Season of use also varies by allotment, but generally grazing occurs between mid-May or mid-June to late-September.

80.    The Forest Service authorizes grazing on these allotments, including through permits and Annual Operating Instructions ("AOI").  In 2014 and 2015, the Forest Service issued AOIs for permittees to graze allotments within the upper Sprague and upper Sycan watersheds, including Paradise Creek, Bear Lakes, Currier Camp, and Withers Special Use allotments.  The Forest Service issued an AOI for the Pothole allotment in 2014 but not in 2015.  It also renewed the permits for the Bear Lakes allotment in 2014.

B.    **Forest Service Monitoring and Documentation of Grazing Impacts in the Upper Sprague and Upper Sycan Watersheds**

81.    Livestock grazing degrades aquatic habitat in many ways, including by removing riparian vegetation, destabilizing stream banks, widening stream channels, promoting incised channels, lowering water tables, reducing pool frequency, increasing soil erosion, and altering water quality.  These effects reduce hiding cover for fish, increase summer water temperatures, promote formation of harmful anchor ice (ice on the bottom of streambeds) in winter, and increase sedimentation into spawning and rearing habitats.  Grazing and trampling of seeps, springs, and meadows can contribute sediment to streams, degrading fish habitat, and can also compact soils, reducing groundwater input to streams.  Grazing of uplands, areas away from streams, also indirectly degrades bull trout habitat by causing soil compaction and increased erosion, which lead to higher runoff events and more sediment delivery to streams.

82.    Cattle are attracted to riparian areas, and will often congregate there to take advantage of the water, shade, and lush vegetation.  Livestock are particularly drawn to spawning reaches, since they are flatter and have easier access than other reaches.  Livestock that cross or wade in streams additionally stir up sediment and add nutrients and other pollutants by urinating and defecating in or adjacent to the streams.

83.    To assess the extent of cattle impacts on riparian areas and streams, the Forest Service undertakes various types of monitoring.  Implementation monitoring measures how much vegetation cattle have eaten during the grazing season, while riparian ecological monitoring measures various riparian features to assess their health and status.  Stream surveys and fish habitat effectiveness monitoring measure stream attributes to determine whether stream channel conditions are functioning appropriately for fish habitat.

84.    For implementation monitoring, the Forest Service has designated select sites to

conduct annual monitoring on certain pastures within the ten federal allotments mentioned in ¶ 75, using stubble height in riparian areas and utilization in uplands as monitoring parameters.

85.    Forest Service implementation monitoring data and notes between 2007 and 2010 show numerous problems occurred on multiple allotments, including:  (1) implementation standards (stubble height or utilization) exceeded on the Paradise Creek, Pothole, and Bear Lakes allotments; (2) repeated instances of unauthorized use by cattle on the Bear Lakes, Currier Camp, Withers Special Use, and Pothole allotments; (3) poor fence conditions on the Withers Special Use allotment; (4) multiple reports of heavy cattle browse on willows or other heavy vegetation use, particularly in the Paradise Creek, Bear Lakes, Pothole, and Currier Camp allotments; (4) streambank trampling in the Paradise Creek and Currier Camp allotments; and (5) concerns about soil readiness prior to turnout for the Paradise Creek, Bear Lakes, and Currier Camp allotments.

86.    This same data also shows that several allotments were not monitored consistently during those years for one or more implementation parameters (i.e. stubble height or utilization), including the Withers Special Use, Riverbeds, Foster Butte, Pothole, and Meryl Creek allotments.

87.    Forest Service implementation monitoring data and notes after 2011 show that similar problems continued to occur, including: (1) standards exceedances for one or more parameters on Paradise Creek, Pothole, Currier Camp, Withers Special Use, Bear Lakes, and Yaden Flat allotments; (2) unauthorized cattle use on Bear Lakes, Currier Camp, Withers Special Use, Pothole, and Paradise Creek allotments; (3) cattle browsing willows and/or heavy vegetation use on the Paradise Creek, Bear Lakes, and Pothole allotments; (4) bank trampling on the Currier Camp allotment; and (5) concerns about pre-season soil readiness on the Paradise

Creek and Currier Camp allotments.

88.     Since 2011 several allotments have not been monitored annually for one or more implementation parameters (i.e. stubble height or utilization), including the Withers Special Use and Pothole allotments.

89.     The Forest Service has also designated eleven sites to conduct riparian ecological monitoring via riparian "scorecards" on certain pastures within the ten federal allotments mentioned in ¶ 75.   A riparian scorecard measures ecological status based on plant species composition in relation to "potential natural vegetation" and environmental features that influence ecological function, like rooting depth and abundance, and ground cover/bare soil.

90.     Of the riparian scorecard assessments that the Forest Service has conducted, the most recent monitoring indicates that one of the eleven sites has a "low" riparian ecological status while the remaining ten sites have a "moderate" riparian ecological status.  No site was rated as high status, and only one of the moderate sites had an "upward" trend.  Six of the sites have not been visited since 2003, two have not been visited since 2006 or 2007, and three were visited in 2009 or 2010.  There are several pastures within the ten federal allotments that do not have riparian scorecard plots established.

91.     The Forest Service has also designated two sites within the ten federal allotments mentioned in ¶ 75 to conduct fish habitat effectiveness monitoring every five years.  This monitoring consists of bank stability transects, channel cross sections, and photo points, but does not include pool frequency, width-to-depth ratio, or undercut banks.

92.     One of the established sites is on the North Fork Sprague River within the Paradise Creek allotment, and the other is on Coyote Creek (a tributary to the Sycan River) within the Foster Butte allotment.  The most recent monitoring data, collected prior to 2011,

shows that several parameters of aquatic health are in poor or degraded condition. For example, the data on the North Fork Sprague River showed that the percentage of the greenline covered in vegetation has decreased, stream temperatures have consistently exceeded 21°C, and bank stability remains below 80%. A Forest Service aquatic restoration plan shows that there are 4,690 feet of actively eroding streambanks on this river within the Paradise Creek allotment, due at least in part to grazing.

93. The Forest Service has not conducted five-year fish habitat inventories on the Sycan River as required by the Wild and Scenic River Monitoring Plan.

94. The Forest Service has conducted stream surveys on some streams within the ten federal allotments mentioned in ¶ 75. Stream surveys monitored parameters like substrate, bank stability, pool frequency, large woody debris, and width-to-depth ratio. They did not monitor undercut banks or riparian shade. Many of these stream surveys are from before 2005.

95. Stream surveys conducted by the Forest Service before 2011 show that reaches of multiple streams did not meet Forest Plan objectives for width-to-depth ratio or pool frequency, including multiple streams on the Paradise Creek, Bear Lakes, and Currier Camp allotments. The latest stream survey for the Sycan River, conducted in 1999, showed that the river also did not meet channel width-to-depth or pool habitat objectives under the Sycan River Management Plan. In addition, the data showed that reaches of streams within the Bear Lakes, Currier Camp, Withers Special Use, and Pothole allotments had greater than 20% surface fines under 6mm; and noted the presence of algae and brook or brown trout in many streams throughout the area.

96. Stream surveys conducted in 2011 or later continued to document width-to-depth ratios that exceeded Forest Plan objectives on reaches of streams within the Pothole, Paradise Creek and/or Currier Camp allotments. These surveys also noted stream reaches with high

surface fines in these same allotments.

97.    Finally, the Forest Service has conducted semi-regular monitoring of stream temperatures on multiple streams within the ten federal allotments mentioned in ¶ 75.  These data show that streams within these allotments have exceeded applicable state water quality standards and the INFISH water temperature RMOs, and that the upper segment of the Sycan River has exceeded the applicable water temperature standard set out in the river Management Plan.

98.    In 2004, DEQ designated the following streams within these allotments as having bull trout spawning and rearing beneficial use: North Fork Sprague River, Cold Creek, Dead Cow Creek, School Creek, Gold Creek, South Fork Sprague River, Camp Creek, Corral Creek, Buckboard Creek, Whitworth Creek, South Fork Sycan River, Boulder Creek, the Sycan River from headwaters to Rock Creek, and Coyote Creek.  The water temperature standard for these streams is 12°C / 53.6°F.

99.    DEQ designated the following streams within these allotments as having redband or Lahontan cutthroat trout beneficial use: Sycan River downstream of Rock Creek, Paradise Creek, Skull Creek, Watson Creek.  The temperature standard for these streams is 20°C / 68°F.

100.    Stream temperature data collected between 2004 and 2010 within the Paradise Creek, Bear Lakes, Foster Butte, Pothole, Currier Camp, and/or Withers Special Use allotments show that water temperatures in many of these streams exceeded the applicable state standards. For example, the North Fork Sprague and South Fork Sprague rivers, and Camp, Corral, Cold, and Rifle Creeks within the Pothole, Paradise Creek, and Currier Camp allotments exceeded the applicable 12°C standard during that period, sometimes for multiple years in a row.  In addition, Paradise Creek within the Currier Camp allotment exceeded the applicable 20°C standard for at least four years during that period.

101.    Stream temperature monitoring data collected since 2010, including in 2013, show that water temperatures on these and additional streams have exceeded the applicable state standards in multiple years.  For example, water temperature data collected during that period show that the North Fork and South Fork Sprague rivers, the Sycan and South Fork Sycan rivers, and Coyote, Camp, Corral, Cold, and Rifle creeks exceeded the applicable 12°C standard, sometimes in multiple years.   Data was collected on these streams within the Paradise Creek, Pothole, Foster Butte, Bear Lakes, Currier Camp, and/or Withers Special Use allotments.   In addition, water temperature data collected within the Currier Camp and Paradise Creek allotments during that period show that the Sycan River and Paradise, Skull, and Watson creeks exceeded the applicable 20°C standard.

102.    These Forest Service data also show that water temperatures collected in streams within several allotments exceeded the INFISH water temperature RMO for spawning and rearing as well as for adult holding habitat.  The water temperature data discussed above that exceeded the 12°C bull trout spawning and rearing standard also violated the INFISH temperature RMO of 8.9°C / 48°F for spawning and rearing habitats.[2]  Additionally, temperature data from 2004-2010 for the North Fork Sprague River, and Camp, Cold, Rifle, and Paradise creeks exceeded the INFISH 15°C / 59°F RMO for adult holding habitat, while 2011-2013 data showed exceedances of that standard in the North Fork Sprague, Sycan, and South Fork Sycan rivers, as well as Coyote, Watson, Cold, Paradise, Rifle, and Skull creeks.  This water temperature data was collected within the Pothole, Paradise Creek, Foster Butte, Bear Lakes, Currier Camp and/or Withers Special Use allotments.

103.    Forest Service water temperature data collected within the upper segment of the

---

[2] The Forest Service has stated that potential bull trout spawning and rearing habitat occurs in at least the headwaters of the Sycan and South Fork Sprague rivers, the North Fork Sprague River, South Fork Sycan River, and Camp, Corral, Boulder, and Cold creeks.

Wild and Scenic Sycan River also show that water temperatures on that river within the Bear

Lakes, Currier Camp and/or Withers Special Use allotments exceeded the standards in the Sycan

River Management Plan (12.7°C / 55°F for third order streams or lower and 14.4°C / 58°F for

fourth order streams or higher), including in 2012 and 2013.

104.    Forest Service data documenting high water temperatures, high surface fine

sediment, and algal blooms in streams within grazed allotments, including the Bear Lakes,

Paradise Creek, Currier Camp, and Withers Special Use allotments, also indicates likely

violations of water quality standards for pH, dissolved oxygen, and sediment or turbidity.

105.    Forest Service riparian and stream habitat monitoring indicates that livestock

grazing is contributing to the increased water temperatures and water quality violations in at least

the Paradise Creek, Currier Camp, Withers Special Use, Bear Lakes, and Pothole allotments by

removing riparian vegetation, increasing width-to-depth ratio, contributing to bank instability,

and increasing sediment in streams.

### C.    Other Monitoring and Documentation of Grazing Impacts in the Upper Sycan and Upper Sprague Watersheds

106.    Since at least 2011, visitors to the upper Sycan and upper Sprague watersheds

have expressed concern about aquatic and riparian conditions there.

107.    Several visitors to the upper Sycan have observed and reported degraded

streamside conditions to the Forest Service.  These visitors, including a professional hydrologist,

sent photos and letters/reports to the Forest Service in March 2015 showing incised and over-

widened channels, lack of riparian vegetation and shade, and high levels of sediment and algae in

the upper Sycan River.  Data and field observations from these individuals, including the

hydrologist, indicate that livestock grazing has destabilized streambanks and incised the channel

along several stretches of the upper Sycan River, particularly within the Currier Camp, Withers

Special Use, and Bear Lakes allotments.  These impacts contribute to high fine sediment and substantial algal mats in the streambed.  Livestock grazing along the upper Sycan in these areas has also limited or inhibited growth of willows and other native riparian vegetation.

108.    *See* below photos of the Sycan River, within the segment designated as "scenic" Wild and Scenic River, sent to the Forest Service in a series of reports in March 2015.



*Upper Sycan River, Fremont-Winema National Forest.  Photo by Jonathan Rhodes, Oct. 2014.*



*Upper Sycan River, Fremont-Winema National Forest.  Photo by Wendell Wood, Oct. 2014.*



*Upper Sycan River, Fremont-Winema National Forest.  Photo by Jonathon Rhodes, Oct. 2014.*



*Upper Sycan River, Fremont-Winema National Forest.  Photo by Native Fish Society, Sept. 2014.*

109.    These visitors also observed, photographed, and reported degraded conditions in tributaries to the Sycan River within the Currier Camp, Withers Special Use, and Bear Lakes

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 30

allotments, including the South Fork Sycan River, Paradise Creek, Skull Creek, Rifle Creek, Crazy Creek, Watson Creek, and several other tributaries. Degraded conditions consisted of over-widened and/or incised stream channels, a lack of overhanging banks, a lack of riparian cover such as willow, bank instability, high surface fine sediment, and algal mats.

110.    These visitors also observed, photographed, and reported these same degraded conditions in the North Fork Sprague River and several of its tributaries such as Cold Creek, Dead Cow Creek, and School Creek, which fall within the Paradise Creek and Bear Lakes allotments.

111.    These observations and reports indicated that livestock grazing is substantially contributing to these impacts, which in turn contribute to violations of water temperature and other water quality standards and result in impaired fish habitat.

112.    These visitors also stated that observing the degraded conditions, as well as the prevalent cow feces, in the upper Sycan and upper North Fork Sprague watersheds impaired their recreational and scenic experiences.

**III.    Forest Service Consultation With FWS over Livestock Grazing**

    **A.    2007 Consultation**

113.    In 2007, the Forest Service and FWS completed consultation over the impacts of livestock grazing and associated activities on several threatened or endangered fish species in the Sprague Section 7 Watershed. The Sprague Section 7 Watershed includes the North Fork Sprague River, South Fork Sprague River, and Sycan River sub-watersheds. On April 4, 2007, the Forest Service issued a BA describing the potential impacts of federally-authorized grazing on several species, including Klamath River bull trout. The BA also described the potential impacts of grazing on critical habitat for bull trout, as it was designated under the 2005 rule.

114.    The 2007 BA's analysis covered twenty-one allotments within the upper Sprague and upper Sycan watersheds, including Pothole, Paradise Creek, Skull Creek, Currier Camp,[3] Withers Special Use, and Bear Creek[4] allotments.

115.    The 2007 BA outlined six steps for the Forest Service to take when implementing its grazing program in these watersheds.  The first step was updating allotment management plans and allotment operating instructions.  The second step was assigning grazing strategies to be implemented at proper use levels.

116.    The third step was assessing stream classification and sensitivity by conducting qualitative Proper Functioning Condition ("PFC") assessments.  The BA directed that within five years, the Forest Service would re-assess nine long-term stream reaches that had been rated as either "functioning at risk" or "functioning inappropriately" in 2005.  A minimum of ten percent rated at PFC in 2005 would be re-assessed within the ten-year consultation window.  This classification was to help determine proper use levels on the assessed streams.

117.    The fourth step was annual implementation monitoring of utilization and stubble height.  For allotments with a LAA determination, monitoring would be conducted annually.  For NLAA allotments, a minimum of twenty percent of the allotment's pastures would be monitored annually.  The BA also outlined schedules for pasture checks, expectations for removal of excess livestock, and criteria for measuring annual compliance with standards.  The BA committed the Forest Service to conducting an annual management review with FWS, and to submitting annual implementation monitoring reports to FWS.

118.    The fifth step directed the Forest Service to conduct effectiveness monitoring to determine trends in riparian and adjacent upland area conditions.  The BA stated that riparian

---

[3] Pastures from Skull Creek and Currier Camp allotments were later administratively combined.
[4] The name of Bear Creek allotment was later changed to Bear Lakes allotment.

scorecards would be the primary method used by the Forest Service to determine the trend of riparian vegetation conditions over time.  The BA stated that most pastures already had a riparian scorecard plot established, but that pastures without plots would have them established.  Trend would be determined every five to ten years on all allotments.  The BA also stated that channel cross-sections, photo points, and bank stability transects would be monitored at a series of existing fish habitat effectiveness monitoring sites.  Allotments with ESA-listed species present in its pastures would have fish habitat effectiveness monitoring sites created if a site did not already exist.  The Forest Service was required to complete a grazing effectiveness monitoring report every five years with data from this monitoring.

119.    The sixth step outlined in the 2007 BA was implementation of a system of adaptive management to ensure livestock grazing resulted in desired conditions.

120.    In the 2007 BA, the Forest Service relied on compliance with these six steps to reach its conclusions that livestock grazing on all allotments in the Sycan and upper Sprague watersheds would either have no effect on or was not likely to adversely affect bull trout or its critical habitat.  The Forest Service also reached this conclusion due in part to the distance between livestock grazing and occupied or designated critical habitat, reasoning that sediment from grazing would settle out in depositional areas before reaching occupied habitat.  The Forest Service additionally concluded that livestock grazing would have insignificant to no effect on overstory vegetation that provides the majority of the shade to streams.

121.    On May 8, 2007, FWS issued a LOC concurring with the Forest Service's determinations in the 2007 BA.  FWS incorporated the Forest Service's six-step management plan into its LOC, including management review and required coordination in the event of permit noncompliance.  Relying on this, FWS agreed with the Forest Service's determination

that grazing was not likely to adversely affect Klamath River bull trout and its designated critical habitat. FWS reasoned that effects to water quality and instream sediment deposition were expected to be negligible, the amount of sediment transported downstream to occupied habitat would be immeasurable, and, according to PFC surveys, conditions of streams within the allotments were in an upward trend.

### B.  2011 Reinitiation of Consultation

122.    In 2011, the Forest Service reinitiated consultation with FWS over the effects of livestock grazing in the Sprague Section 7 watershed on the newly revised, 2010 designated critical habitat for Klamath River bull trout. On April 20, 2011, the Forest Service issued a supplemental BA ("SBA") meant to address differences between the previously designated bull trout critical habitat and the 2010 revision. The SBA addressed the impacts of livestock grazing on fourteen allotments containing more than seventy-five miles of critical habitat, including the Paradise Creek, Bear Lakes, Currier Camp, Withers Special Use, and Pothole allotments.

123.    The 2011 SBA incorporated the monitoring and adaptive management requirements described in the 2007 BA. The 2011 SBA did not supplement or alter those requirements.

124.    The 2011 SBA addressed the impacts of livestock grazing on bull trout critical habitat PCEs within the allotments considered. The Forest Service conducted this assessment without having any implementation or effectiveness monitoring information on six critical habitat streams actively grazed within the Bear Lakes and Currier Camp allotments. The agency also had no monitoring information on numerous intermittent streams, seeps, springs, and meadows that provide flow to or otherwise influence designated critical habitat within multiple allotments.

125.    With regard to the monitoring outlined in the 2007 consultation, the Forest Service had completed some, but not all, of the required monitoring.  As described above, between 2007 and the issuance of the 2011 SBA, several allotments had not been monitored consistently for one or more implementation monitoring parameters, while six riparian scorecard plots had not been visited since 2003 and several pastures within the fourteen allotments assessed did not have any riparian scorecard plots established.

126.    The Forest Service's fish habitat effectiveness monitoring occurred at only two sites within the fourteen allotments despite more than 75 miles of designated critical habitat, and did not monitor pool frequency, width-to-depth ratio, or undercut banks.  The Forest Service had never monitored undercut banks or riparian shade on any critical habitat streams or their tributaries within any of the allotments addressed in the 2011 consultation.

127.    As described above, the monitoring data that did exist showed that livestock were contributing to degraded riparian and aquatic conditions on streams within several of the consultation allotments.  Implementation data and notes reported heavy cattle use of willows and other riparian vegetation, streambank trampling and instability, multiple instances of unauthorized use, and concerns about soil conditions before turnout on these allotments.

128.    Riparian scorecard monitoring showed none of the sites at high ecological status and only one with an upward trend, while the limited fish habitat effectiveness monitoring showed decrease in riparian vegetation, high water temperatures, and bank stability below objectives on the Paradise Creek allotment.

129.    Similarly, stream survey data collected prior to the 2011 SBA showed reaches of streams within multiple allotments not meeting objectives for width-to-depth ratio or pool frequency, and containing algal blooms as well as brown or brook trout.  These stream surveys

also showed greater than 20% surface fines under 6mm in several streams.

130.    The 2011 SBA itself described active sloughing on both banks of the North Fork

Sprague within the Paradise Creek allotment, and stated that the river has lost connectivity with

its floodplain and has "issues" with bank stability, pools, instream cover, and riparian vegetation.

The SBA admitted that high fine sediment levels are a limiting factor for bull trout reproduction

and that significant stretches of low-gradient, depositional areas occur within and/or downstream

of the allotments covered by the 2011 consultation.

131.    The 2011 SBA also stated that several allotments contained critical habitat

streams or direct tributaries to critical habitat where recorded summer water temperatures exceed

the 15°C (59°F) PCE, which limits the occurrence of bull trout.  Temperature monitoring data

from before 2011 confirmed that water temperatures in numerous streams, both designated

critical habitat and their tributaries, have repeatedly exceeded the bull trout PCE of 15°C (59°F).

132.    Despite the gaps in monitoring and the content of the existing monitoring data, the

Forest Service determined that livestock grazing was not likely to adversely affect newly

designated bull trout critical habitat on any of the allotments covered by the consultation.  The

rationale for this conclusion was that grazing would either have no effect or insignificant effects

on the critical habitat PCEs.  The 2011 SBA did not explain how the monitoring data was

sufficient to support these conclusions.

133.    The 2011 SBA also concluded that livestock grazing on some allotments would

have no effect on bull trout critical habitat due to lack of perennial flow or lack of hydrologic

connection to critical habitat.   The 2011 SBA drew this conclusion without discussing or fully

analyzing conditions of intermittent or perennial tributary streams, or the full impact of those

tributary streams on critical habitat.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 36

134.    The 2011 SBA's discussion of the environmental baseline did not disclose the full number and range of ongoing actions in the assessed watersheds, including but not limited to water diversions and impoundments and activities on private lands.

135.    The 2011 SBA's effects analysis failed to fully disclose and analyze numerous relevant factors, including: the condition of and impacts to important bull trout habitat features; condition of and impacts to seeps, springs and subsurface flows; the documented occurrence of unauthorized grazing on these allotments; water quality parameters other than water temperature; an explanation for high water temperatures; and effects of the presence of competitor species, such as brown or brook trout, on bull trout.

136.    The 2011 SBA drew conclusions about impacts to some critical habitat streams based on compliance with implementation monitoring standards, season of use, and other factors unrelated to stream channel conditions and unsupported by any data on those conditions.

137.    The 2011 SBA also relied on the same monitoring scheme from the 2007 consultation to support its NLAA determination even though the Forest Service has not fully implemented that monitoring scheme and the monitoring is not sufficient to assess impacts to and protect bull trout critical habitat.

138.    The 2011 SBA's discussion of cumulative effects did not disclose specific state, local, or private actions.  It also discounted cumulative effects as localized and short-term and relied on monitoring to minimize them, but did not fully explain why these effects, when combined with the proposed federal grazing, would not constitute an adverse effect to bull trout critical habitat.

139.    On May 16, 2011, FWS issued a letter concurring with the Forest Service's 2011 SBA and conclusions therein.  The LOC consisted of a one-and-a-half-page letter that relied

exclusively on the information in the 2011 SBA, and concluded that topography, intermittent hydrology, and grazing strategies would minimize effects to critical habitat. The LOC's conclusion was based in part on inaccurate information, including the statement that the Paradise Creek allotment contains only intermittent hydrology and thus opportunities for sediment inputs and water temperature influences are restricted to run off conditions. The Paradise Creek allotment does contain intermittent streams, but it also contains approximately five river miles of the perennial North Fork Sprague River, which is critical habitat.

### FIRST CLAIM FOR RELIEF

**The Forest Service's Authorization of Grazing in 2014 and 2015 on the Currier Camp, Withers Special Use, and Bear Lakes Allotments Violated the WSRA and NFMA.**

140.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

141.    This first claim for relief challenges the Forest Service's authorization of grazing on the Currier Camp, Withers Special Use, and Bear Lakes allotments along the Sycan River in 2014, 2015 and in future years, for violations of the WSRA, 16 U.S.C. § 1271 *et seq*., and NFMA, 16 U.S.C. § 1600 *et seq*., and NFMA's implementing regulations. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

142.    The WSRA requires agencies to administer designated rivers to "protect and enhance" the values that caused the river to be designated. 16 U.S.C. § 1281(a). The Forest Service must take action to adjust management "as may be necessary to protect such rivers in accordance with the purposes of this Act." *Id*. § 1283(a). The Sycan River Management Plan was developed "to provide for the protection of river values." *Id*. § 1274(d).

143.    As described above, the Forest Service violated the WSRA by authorizing grazing along the upper Sycan River on the Currier Camp, Withers Special Use, and Bear Lakes allotments in 2014 and 2015 when such grazing is inconsistent with protection and enhancement

of the wild and scenic river values for which the river was designated and must be managed.

144.    Specifically, livestock grazing has degraded fish and wildlife and scenic values articulated in the river designation, in violation of the goals, standards, and guidelines in the Management Plan meant to protect the river values.  The Forest Service has failed to take specific management actions required under the Management Plan and to conduct habitat and stream monitoring required under the Monitoring Plan that must be implemented to protect river values.  Accordingly, the Forest Service's authorization of livestock grazing in the river corridor in 2014 and 2015 is inconsistent with the Forest Service's duty to "protect and enhance" the values of the Sycan River.  16 U.S.C. § 1281(a).

145.    Furthermore, NFMA requires the Forest Service to act consistently with direction in the applicable forest plan when authorizing any project or activity.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.15.  The Sycan River Management Plan was incorporated into the Fremont Forest Plan in 1992.  The Forest Service has violated NFMA by authorizing grazing in 2014 and 2015 on the Currier Camp, Withers Special Use, and Bear Lakes allotments that is inconsistent with direction in the river Management Plan and Fremont Forest Plan regarding protection and enhancement of Wild and Scenic river values and resources.

146.    Accordingly, the Forest Service's 2014 and 2015 AOIs for the Currier Camp, Withers Special Use, and Bear Lakes allotments, and the 2014 permit renewals for the Bear Lakes allotment, are arbitrary, capricious, an abuse of discretion, and not in accordance with the WSRA and NFMA, and therefore violate the APA, 5 U.S.C. § 706(2)(A).

147.    These violations have caused or threaten serious prejudice and injury to Plaintiffs' rights and interests.  Absent judicial relief, such violations of WSRA and NFMA will continue to occur by authorizing grazing on the Currier Camp, Withers Special Use, and Bear Lakes

allotments in 2014, 2015 and future years.

## SECOND CLAIM FOR RELIEF

**The Forest Service's Authorization of Grazing in 2014 and 2015 on the Paradise Creek, Currier Camp, Withers Special Use, Bear Lakes, and Pothole Allotments Violated the CWA and NFMA.**

148.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

149.    This second claim for relief challenges the Forest Service's violations of the CWA, 33 U.S.C. § 1251 *et seq.*, and NFMA, 16 U.S.C. § 1600 *et seq.* and NFMA's implementing regulations, by authorizing grazing on the Paradise Creek, Currier Camp, Withers Special Use, Bear Lakes, and Pothole allotments in 2014, 2015 and in future years without ensuring that grazing complies with water quality standards.  Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

150.    Section 313 of the CWA requires all federal agencies with jurisdiction over property or engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants to comply with all state water quality standards.  33 U.S.C. § 1323(a).  The Oregon state water quality regulations contain standards for water temperature, dissolved oxygen, pH, turbidity, *E. coli*, and biocriteria.  *See* OAR 340-041-0028(4), 340-041-0016, 340-041-0021, 340-041-0036, 340-041-0009, and 340-041-0011.  Oregon state water quality regulations no longer contain a provision allowing the Forest Service to comply with water quality standards simply by implementing a water quality restoration plan or best management practices.

151.    In addition, the Fremont Forest Plan contains goals, standards, and guidelines directed at protecting water quality and requiring the Forest Service to meet all applicable state and federal water quality standards.  The Forest Plan also contains INFISH's standards and guidelines for managing grazing so as not to retard or prevent attainment of RMOs, including the

temperature RMO.

152.    Forest Service and other data show that applicable state water temperature standards are being violated for numerous streams within the Paradise Creek, Bear Lakes, Currier Camp, Withers Special Use, and Pothole allotments, including but not limited to Cold Creek, the North Fork Sprague River, Paradise Creek, Rifle Creek, the South Fork Sprague River, the South Fork Sycan River, the Sycan River, and Watson Creek.  Data shows that the INFISH temperature RMO is being exceeded in these and other streams as well.

153.    There is evidence that livestock grazing has substantially contributed and continues to contribute to these violations of water quality temperature standards and exceedance of the INFISH temperature RMO by removing riparian vegetation, creating wider and shallower streams, contributing to incised channels, and compacting soils, among other impacts.

154.    Forest Service and other data indicate that other state water quality parameters, such as dissolved oxygen, pH, *E. coli*, biocriteria, and turbidity, are also being violated, and that livestock grazing is contributing to those violations.

155.    The Forest Service has failed to ensure that its authorized grazing complies with all water quality standards prior to issuing the 2014 and 2015 AOIs for the Paradise Creek, Currier Camp, Withers Special Use, Bear Lakes, and Pothole allotments, as well as the 2014 permit renewals for the Bear Lakes allotment, as required under the CWA.  In addition, the Forest Service's authorization of grazing is inconsistent with applicable standards and guidelines related to water quality within the Fremont Forest Plan, and thus violate NFMA.

156.    Accordingly, the Forest Service's 2014 and 2015 AOIs for the Paradise Creek, Currier Camp, Withers Special Use, Bear Lakes, and Pothole allotments, and the 2014 permit renewals for the Bear Lakes allotment, are arbitrary, capricious, an abuse of discretion, and not

in accordance with the CWA and NFMA, in violation of the APA, 5 U.S.C. § 706(2)(A).

157.    These violations have caused or threaten serious prejudice and injury to Plaintiffs'

rights and interests.  Absent judicial relief, such violations of the CWA and NFMA will continue

to occur by authorizing grazing on the Paradise Creek, Currier Camp, Withers Special Use, Bear

Lakes, and Pothole allotments in 2014, 2015 and future years.

## THIRD CLAIM FOR RELIEF

**The Forest Service's Supplemental Biological Assessment and FWS' Letter of Concurrence
for the 2011 Bull Trout Critical Habitat Consultation are Arbitrary and Capricious.**

158.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

159.    This third claim for relief challenges the Forest Service's and FWS' NLAA

determination in the 2011 SBA and LOC for being arbitrary, capricious, and contrary to the

ESA.  Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C.

§ 706.

160.    An action agency prepares a BA to evaluate the potential "effects of the action"

on listed species and critical habitat and determine whether either is likely to be adversely

affected.  50 C.F.R. § 402.12.  The effects of the action are the direct and indirect effects added

to the environmental baseline.  *See id*. § 402.02.  If the action agency determines that the action

is not likely to adversely affect listed species or critical habitat, FWS can concur with that

determination in an LOC to conclude consultation.  *See id*. §§ 402.13(a), 402.14(b).  An LOC is

only appropriate when the BA or other information indicates that the action has no likelihood of

adverse effect to the listed species or designated critical habitat.  *Id.* § 402.13(a).

161.    Under the APA, an LOC is a final agency action that will not be upheld if it is

found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

5 U.S.C. § 706(2)(A).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 42

162.    FWS' LOC for the 2011 bull trout critical habitat consultation relied on the Forest Service's 2011 SBA.   The SBA discussed the impacts of livestock grazing on designated critical habitat within the allotments considered.  As described above, the FWS' LOC violated the ESA and APA for various reasons, including but not limited to the following:

    a.  The LOC relied upon a flawed SBA that drew conclusions and made assumptions about the effects of grazing on PCEs not supported by data or a rational explanation;

    b.  The LOC relied upon a flawed SBA that failed to consider and discuss important aspects of and impacts to bull trout habitat;

    c.  The LOC relied on a flawed SBA that failed to adequately assess or address cumulative effects and environmental baseline features and conditions;

    d.  The LOC relied on a monitoring scheme, as outlined in the 2007 BA and incorporated into the 2011 SBA, that is not certain to occur, and that does not adequately address the threats from grazing to critical habitat;

    e.  The LOC contained errors and failed to support its own conclusions, assumptions, and rationale with data or rational explanation.

163.    Accordingly, the Forest Service's and FWS' NLAA determination in the 2011 SBA and LOC was arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA, and therefore violates the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the Forest Service's 2014 and 2015 grazing authorizations for the Currier Camp, Withers Special Use, and Bear Lakes allotments violated the WSRA, NFMA, and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF -- 43

NFMA's implementing regulations, and thus were arbitrary, capricious, an abuse of discretion, and/or contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

      B.      Declare that the Forest Service's 2014 and 2015 grazing authorizations for the Paradise Creek, Currier Camp, Withers Special Use, Bear Lakes, and Pothole allotments violated the CWA, NFMA, and NFMA's implementing regulations, and thus were arbitrary, capricious, an abuse of discretion, and/or contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

      C.      Order the Forest Service to ensure that future annual authorizations and permit renewals on the challenged allotments comply with the WSRA, CWA, and NFMA;

      D.      Declare that the Forest Service's SBA and FWS' LOC for the 2011 bull trout critical habitat consultation were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the ESA under the APA, 5 U.S.C. § 706(2);

      E.      Vacate and set aside the SBA and LOC for the 2011 bull trout critical habitat consultation;

      F.      Order the Forest Service and FWS to re-initiate and complete a new consultation addressing federally-authorized livestock grazing in bull trout occupied and critical habitat in the upper Sprague and upper Sycan watersheds on the Fremont-Winema National Forest and remedying the flaws in the 2011 consultation;

      G.      Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be prayed for hereafter by Plaintiffs;

      H.      Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* and/or all other applicable authorities; and

I.       Grant such further relief as the Court deems just and proper in order to provide

Plaintiffs with relief and protect the public interest.

Dated: May 26, 2015          Respectfully submitted,

/s/Lauren M. Rule
Lauren M. Rule (OSB #015174)
ADVOCATES FOR THE WEST
3115 NE Sandy Blvd., Ste. 223
Portland, OR 97232
(503) 914-6388
lrule@advocateswest.org


/s/ David H. Becker
David H. Becker (OSB # 081507)
Law Office of David H. Becker, LLC
833 SE Main Street, #302
Portland, OR 97214
davebeckerlaw@gmail.com

Attorneys for Plaintiffs