IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

OREGON WILD, an Oregon non-profit
corporation; FRIENDS OF LIVING
OREGON WATERS, an Oregon non-profit
corporation; and WESTERN WATERSHEDS
PROJECT, an Idaho non-profit corporation;

Case No. 1:15-cv-00895-CL

**ORDER**

        Plaintiffs;

        v.

U.S. FOREST SERVICE, a federal agency;
and U.S. FISH & WILDLIFE SERVICE,
a federal agency;

        Defendants;

        and

JRS PROPERTIES III, LP., an Oregon
registered foreign limited partnership;

        Defendant- Intervenor,

        and

WITHERS RANCH, INC.; BAR-2 LIVESTOCK,
LLC; BRENDA MORGAN and JAMES R.
BALDWIN, d.b.a. MORGAN RANCH; J-SPEAR
RANCH CO.; OBENCHAIN CATTLE CO.; and
O'LEARY RANCH, INC.,

        Defendant-Intervenors.

/ / /

CLARKE, Magistrate Judge.

Plaintiffs are non-profit environmental organizations. They assert Defendants' continued authorization of livestock grazing on allotments on and near the Sycan River is arbitrary; capricious; and contrary to the Endangered Species Act (ESA), the Clean Water Act (CWA), the National Forest Management Act (NFMA), and the Wild and Scenic Rivers Act (WSRA). Defendant-Intervenors are ranchers permitted to graze cattle on the at-issue land.

Pending before the Court are four motions. Plaintiffs, Defendants, and the Withers Ranch Intervenors move (#45, #58, #59) for summary judgment in their favor on all of Plaintiffs' claims. Intervenor JSR Properties' motion (#60) for summary judgment is limited in scope to Plaintiffs' ESA claim. For the following reasons, Defendants' and Defendant-Intervenors' motions (#58, #59, #60) are GRANTED and Plaintiffs' motion (#45) is DENIED.

## BACKGROUND

The Sycan and Sprague Rivers originate on the eastern edge of the Klamath Basin in south central Oregon. FWS AR 14-17. They flow through the Fremont-Winema National Forest before entering private lands in the valley. FWS AR 15-17. In 1988, Congress designated a segment of the Sycan River as "scenic" under the Wild and Scenic Rivers Act (WSRA). 16 U.S.C. § 1274(a)(103). The U.S. Forest Service adopted the Sycan Wild and Scenic River Management Plan to outline its strategy "to protect and enhance" the river's values. 16 U.S.C. § 1281(a); SUPP POL 1-7. It incorporated the River Plan, along with state water quality standards and an Inland Native Fish Strategy ("INFISH"), into its Forest Plans. POL 1926, 2669-83.

Livestock have grazed in the area since the 1860s. SUPP POL 23. Congress requires the Forest Service "to consider the use of National Forest lands for grazing of livestock." Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1097 (9th Cir. 2003) (citing 16 U.S.C. §

1604(e)(1)). "The Forest Service manages livestock grazing on an allotment by issuing a grazing permit; an allotment management plan (AMP); and an annual operating ... instruction (AOI)." Oregon Natural Desert Ass'n v. Sabo, 854 F.Supp.2d 889, 902 (D. Or. 2012). Grazing permits authorize livestock use on federal lands and set limits on the allowable timing and amount of that use. Id. The Forest Service generally issues permits for ten-year periods. Id. AMPs are allotment-specific planning documents that:

> (i) Prescribe[] the manner in and extent to which livestock operations will be conducted in order to meet the multiple-use, sustained yield, economic, and other needs and objectives as determined for the lands, involved; and
> (ii) Describe[] the type, location, ownership, and general specifications for the range improvements in place or to be installed and maintained on the lands to meet the livestock grazing and other objectives of land management; and
> (iii) Contain[] such other provisions relating to livestock grazing and other objectives as may be prescribed by the Chief, Forest Service, consistent with applicable law.

36 C.F.R. § 222.1(b)(2). As their name implies, AOIs are agreements issued annually by the Forest Service to permittees. Sabo, 854 F.Supp.2d at 902. The Forest Service uses AOIs to respond to changing grazing conditions such as drought, water quality, habitat restoration, or risks to threatened plants or animals. Id.

A distinct population segment of bull trout, called Klamath River bull trout, were once widely distributed in the region's waterways. 63 Fed.Reg. 31647-01 (June 10, 1998). However, over the years, their distribution and numbers declined due, in part, to water diversion, habitat fragmentation, poor water quality, and the introduction of non-native species. Id. In 1998, Klamath River bull trout were listed as a "threatened species" under the Endangered Species Act (ESA), meaning the population is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." FWS 2341; 16 U.S.C. § 1532(20).

Because of their "threatened" status, Klamath River bull trout receive certain protections under the ESA. Federal agencies must insure their actions, including the granting of permits, are "not likely to jeopardize the continued existence of" listed threatened species "or result in the destruction or adverse modification of [the species' critical] habitat[.]" 16 U.S.C. § 1536(a)(2). Agencies fulfill this obligation by consulting with a designated wildlife agency before engaging in any action that may affect a listed species or its critical habitat. The ESA and its implementing regulations set forth a framework for this interagency consultation. First, the acting agency must prepare a "biological assessment" (BA) to "evaluate the potential effects of the action on listed ... species and designated ... critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action...." 50 C.F.R. § 402.12(a). If it determines adverse effects are unlikely, and the consulting agency agrees, then "the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a). If it determine adverse effects are likely, "formal consultation" with a consulting agency is required. 50 C.F.R. § 402.14(a)-(c). During the formal consultation process, the consulting agency writes a biological opinion to determine "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).

The Forest Service has conducted several ESA consultations with the U.S. Fish and Wildlife Service (FWS) regarding the impacts of authorized grazing on Klamath River bull trout. First, in 1998, the Forest Service and FWS evaluated the effects of timber salvage, grazing, and hydropower activities on bull trout. FWS 2300-01, 2317. At that time, all streams occupied by Klamath River bull trout were closed to grazing except for the North Fork of the Sprague River. FWS 2315. FWS issued a biological opinion concluding that grazing activities were likely to

adversely affect bull trout, especially in the North Fork of the Sprague River watershed, but were not likely to jeopardize the continued existence of the population because of restoration and monitoring effects. FWS 2300-16. FWS anticipated that grazing would "take"[1] bull trout by causing "degraded habitat conditions, habitat fragmentation, and additional environmental disturbance such as reduction of water quantity or quality, aquatic and streamside vegetation, cover, and stream roughness." FWS 2317.

In 2000, FWS issued a biological opinion on grazing activities within the Silver Creek Pasture of the Fremont National Forest. FWS 2337. It concurred with the Forest Service's assessment that grazing was likely to adversely affect bull trout within the Coyote Creek drainage "by impacting riparian areas and slowing their rate of recovery as compared to no grazing." FWS 2337. However, FWS ultimately concluded that the proposed grazing was not likely to jeopardize the continued existence of Klamath River bull trout. FWS 2351. Among other mitigating factors, the FWS noted that occupied bull trout streams would be excluded from grazing, and the Forest Service would continue restoration and recovery efforts. FWS 2351. To reduce foreseen impacts, FWS imposed multiple restrictions on grazing including monitoring and limits on grazing periods. FWS 2353-55. Because bull trout had no designated critical habitat at the time, FWS concluded none would be affected. FWS 2351.

In 2005, FWS designated critical habitat for the Klamath River bull trout. FWS 226. In 2007, the Forest Service completed BAs on proposals to authorize grazing in the Sprague and Lost River watersheds. FWS 1041. It concluded that grazing would have only "negligible and insignificant" effects on bull trout and its critical habitat due, in part, to its use of "adaptive management based on monitoring[.]" FWS 761-66. FWS concurred. FWS 1041-47.

---

[1] In the ESA context, the term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

In 2010, FWS expanded the critical habitat deemed essential to bull trout recovery. FWS

1165-66, 1171, 2420-26, 2430. In pertinent part, it stated:

> [I]n the Klamath Basin Recovery Unit where threats to bull trout are greatest, we are designating all habitat known to be occupied at the time of listing that contains the physical or biological features essential to the conservation of the species and that may require special management considerations or protection, and we are also designating a substantial proportion of unoccupied habitat outside of the geographical area occupied by the species at the time of listing that has been determined to be essential for bull trout conservation. Our primary consideration for designating critical habitat for occupied areas was to protect species strongholds for spawning and rearing and [foraging, migration, and overwintering (FMO)] habitats. Our primary consideration for designating most of [the] unoccupied areas we are including in this designation was to restore connectivity among populations by protecting FMO habitats.

FWS 1165-66. FWS acknowledged that "livestock grazing contributed to the decline in bull trout

abundance and distribution." FWS 1144. However, it noted that grazing and fish habitat

conservation are not "mutually exclusive in all cases, provided appropriate special management

needs for particular areas are implemented." FWS 1144.

In 2011, the Forest Service reinitiated ESA consultation to assess the effect of grazing on

the newly designated critical habitat. FWS 1423. In a supplement to the 2007 BAs, the Forest

Service recognized:

> Livestock grazing has the potential to degrade aquatic habitat by removing riparian vegetation, destabilizing stream banks, widening steam channels, promoting incised channels and lowering water tables, reducing pool frequency, increasing soil erosion, and altering water quality. These effects increase summer water temperatures, reduce cover, promote formation of anchor ice in winter, and increase sediment in spawning and rearing habitats.

FWS 1431. However, after reviewing the physical and biological features of each allotment, the

Forest Service concluded grazing would have no effect on five critical habitat allotments, and

was not likely to adversely affect another ten allotments containing critical habitat. FWS 1427-

48. It explained:

> All effects identified in the allotments are insignificant. Several of the allotments are separated from critical habitat streams by geology; although cattle may access the stream, access is difficult and limited. Several allotments have mainly intermittent hydrology, opportunities for sediment inputs and water temperature influences are restricted to run off conditions when high flows in the receiving streams are likely to dilute any effects to that system. The six steps outlined in the 2007 BA for monitoring and implementation are structured to maintain flexibility within the Forest's grazing program to readily facilitate annual changes, when warranted, throughout the life of the action. Maintaining this flexibility will result in improved on-the-ground management.

FWS 1448. FWS issued a two-page Letter of Conferral (LOC) stating, pertinent part: "Based on

the Service's review of the biological assessment, we concur with the Forest's determination that

the continued cattle grazing in the three Action Areas is not likely to adversely modify bull trout

critical habitat. Therefore, further consultation, pursuant to section 7(a)(2) of the Act, is not

required." FWS 1462-63.

## STANDARD

The parties have filed cross motions for summary judgment under Federal Rule of Civil

Procedure 56. In this context, "summary judgment" is "simply a convenient label to trigger"

judicial review. Klamath Siskiyou Wildlands Ctr. v. Gerritsma, 962 F.Supp.2d 1230, 1233 (D.

Or. 2013), aff'd sub nom. Klamath-Siskiyou Wildlands Ctr. v. Gerritsma, No. 13-35811, 2016

WL 775297 (9th Cir. Feb. 29, 2016). The Administrative Procedure Act (APA) governs. It

allows a court to set aside a final agency action only if it is "arbitrary, capricious, an abuse of

discretion, or not otherwise in accordance with the law." 5 U.S.C. § 706(2)(A). "A decision is

arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to

consider, entirely failed to consider an important aspect of the problem, offered an explanation

for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n, 92 F.3d 940, 942 (9th Cir. 1996) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

Review under the APA is "searching and careful." Ocean Advocates v. United States Army Corps of Eng'rs, 402 F.3d 846, 858 (9th Cir. 2004). The court must ensure that the agency took a "hard look" at the environmental consequences of its proposed action. Oregon Natural Resources Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997). However, the court may not substitute its own judgment for that of the agency. Ocean Advocates, 402 F.3d at 858. It must presume the agency acted properly and affirm the agency when "a reasonable basis exists for its decision." Independent Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000).

## DISCUSSION

### I.    Endangered Species Act

Plaintiffs challenge the 2011 consultation's conclusion that grazing is not likely to adversely affect (NLAA) bull trout critical habitat. They contend that the Forest Service's BA and FWS' LOC are arbitrary, capricious, an abuse of discretion, not in accordance with the ESA, and, therefore, violate the APA.

/ / /

/ / /

A. Justiciability

Defendants and Defendant-Intervenors mount two challenges to the justiciability of Plaintiffs' ESA claim. First, they contend that the Forest Services' 2011 BA is not a reviewable "final agency action" under the APA. Generally, "two conditions must be satisfied for agency action to be 'final' [and thus subject to judicial review]: First, the action must mark the consummation of the agency's decisionmaking process ... [a]nd second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotations and citations omitted). BAs do not generally constitute final agency actions within the meaning of the APA. Nevertheless, a Court may review a BA where a final agency action, like a LOC, expressly relies on it to conclude further action is not necessary. See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton, No. 3:12-CV-02271-HZ, 2013 WL 3776305, at *6 (D. Or. July 17, 2013) ("In short, the BA is subject to review because the LOC expressly relied on the BA when determining that bull trout did not exist in the Eagle Creek watershed and that no formal consultation was needed."), aff'd in part, rev'd in part and remanded, 752 F.3d 755 (9th Cir. 2014). For example, in Oregon Nat. Desert Ass'n v. Tidwell, District Judge Haggerty declined review of two BAs that triggered formal consultation. 716 F.Supp.2d 982, 995 (D. Or. 2010). The consulting agency prepared a biological opinion and incidental take statement after reviewing the at-issue BAs. These reviewable documents stood alone. Their conclusions did not hinge on support found in the BAs. In contrast, in Connaughton, District Judge Hernandez held a BA was subject to review because it was the sole basis of the consulting agency's decision to refrain from further action. 2013 WL 3776305, at * 6. No formal consultation ensued because of information provided in the BA. Similarly, here, FWS's brief LOC, which carries legal

consequence, expressly adopted and relied on the challenged BA when it determined that formal consultation was not needed. The Court cannot meaningfully review the LOC, which the parties do not dispute qualifies as a final agency action, without referencing the BA on which it is explicitly and exclusively based.

Second, Defendant-Intervenor JSR Properties argues Plaintiffs' ESA claim is moot because the Forest Service has begun re-initiation of consultation. This Court lacks jurisdiction over moot claims. A claim is moot "if it has lost its character as a present, live controversy." Am. Rivers v. Nat'l Marine Fisheries Serv., 126 F.3d 1118, 1123 (9th Cir. 1997). The party asserting mootness bears the burden of establishing that the Court cannot provide an effective remedy. Forest Guardians v. Johanns, 450 F.3d 455, 461 (9th Cir. 2006). The question is not whether the precise remedy requested is available, but whether the Court can shape *any* effective relief. Nw. Envtl. Def. Ctr. v. Gordon, 849 F.2d 1241, 1244-45 (9th Cir. 1988). JSR has not carried this "heavy" burden. Id. at 1244. The challenged consultation is currently operative and will remain so through the upcoming grazing season. Fed. Defs.' Mot., at 6; compare Grand Canyon Trust v. U.S. Bureau of Reclamation, 691 F.3d 1008, 1017 (9th Cir. 2012), as amended (Sept. 17, 2012) (a challenge to an existing consultation becomes moot when a new consultation is completed that supersedes it). Relief remains available from its alleged defects notwithstanding the Forest Service's preliminary efforts to reinitiate. Johanns, 450 F.3d at 463 ("Because such relief remains available to Forest Guardians notwithstanding the Forest Service's re-initiation of consultation on Water Canyon, the agency has failed to carry its burden to establish mootness."); Tidwell, 716 F.Supp.2d at 994-95 (finding challenged grazing authorizations were not mooted by subsequent agency actions). Moreover, JSR has not demonstrated why this Court is unequipped to remedy damages sustained from the consultations' past grazing seasons. See Tidwell, 716

F.Supp.2d at 994 ("The grazing that takes place on each allotment during a season can have carryover effects that might last one or more seasons into the future. The fact that new annual grazing authorizations have been issued does not mean that damage from previous seasons cannot be remedied."). For these reasons, the Court finds Plaintiffs' ESA claim is still a live controversy fit for judicial review.

      B.  General Factors

Plaintiffs assert the agencies failed to consider important factors during their 2011 consultation including (1) inconsistences with prior consultations, (2) the recovery purpose of critical habitat, and (3) the full impact of public land grazing when paired with cumulative effects and climate change. The Court will address each alleged error in turn.

      i.  Inconsistencies with Earlier Consultations

To ensure prior standards are not ignored or inadvertently altered, an agency must supply a reasonable explanation for a change in course or "swerve from prior precedents[.]" Bush-Quayle '92 Primary Comm., Inc. v. Fed. Election Comm'n, 104 F.3d 448, 453 (D.C. Cir. 1997); see also Humane Soc. of U.S. v. Locke, 626 F.3d 1040, 1048-51 (9th Cir. 2010). Plaintiffs suggest the agencies violated this requirement by shifting their position on grazing's effects on bull trout habitat without sufficient explanation or support. They question why the agencies concluded grazing was likely to adversely affect bull trout by degrading and fragmenting their habitat in 1998 and 2000, but found grazing was not likely to adversely modify critical habitat in 2011. The answer is not readily apparent from the record. The agencies did not discuss their 1998 and 2000 conclusions in the 2011 consultation. The Court would be more concerned by this apparent omission if the agencies hadn't consulted between 2000 and 2011. But they did. In 2007, FWS concluded that grazing was not likely to adversely affect Klamath River bull trout or

its critical habitat. FWS 1046. Considering the 2011 opinion in conjunction with all prior consultations, not just the earliest two, it becomes apparent that the opinion was not a sharp shift from the agencies' prior decisions, but rather a continuation of them. Because the agencies did not change their position in 2011, they had nothing to explain. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515-516 (2009) (an agency must provide "a reasoned explanation" when its new course "rests upon factual findings that contradict those which underlay" its prior course).

### ii.  Recovery

The ESA requires federal agencies to insure, through consultation, that their proposed actions are "not likely to … result in the destruction or adverse modification of" bull trout critical habitat. 16 U.S.C. § 1536(a)(2). Neither the ESA, nor its regulations, delineate the precise issues an agency should consider to determine whether an action will adversely modify habitat. However, the statute's definitions clarify the scope of the inquiry. Critical habitat is defined, in pertinent part, as "the specific areas within the geographical area occupied by the species … on which are found those physical or biological features … *essential to the conservation of the species*[.]" 16 U.S.C. § 1532(5)(A) (emphasis added). In turn, conservation is defined as those methods necessary to recover a species, or to bring a species to a point where it no longer needs the ESA's protection. 16 U.S.C. § 1532(3). The Court reads these definitions, together with the ESA's consultation requirement, to mean that critical habitat consultation necessitates consideration of the species' recovery. Ctr. For Native Ecosystems v. Cables, 509 F.3d 1310, 1322 (10th Cir. 2007) ("Section 1536(a)(2) requires federal agencies, when considering the effect of their actions on a species' critical habitat, to consider the effect of those actions on the species' recovery."). This is in line with the ESA's dual goals of not merely promoting listed

species' survival, but allowing them "to recover to the point where [they] may be delisted." Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1070 (9th Cir.), amended sub nom., 387 F.3d 968 (9th Cir. 2004).

Plaintiffs assert the agencies failed to address bull trout recovery in their 2011 consultation. The Court disagrees. The 2011 consultation was initiated in direct response to FWS' designation of new critical habitat, which was explicitly chosen "to achieve recovery." FWS 1165. As such, "it is hard to see how the Forest Service's [BA], and the FWS's ultimate concurrence with the conclusions of that review, could have been directed at anything but recovery." Cables, 509 F.3d at 1322. Moreover, the BA includes a detailed discussion of the biological and physical features deemed "essential to bull trout conservation" for each affected allotment. FWS 1427, 1432-46. As discussed above, in the ESA context, conservation encompasses recovery. See 16 U.S.C. § 1532(3). Therefore, the agencies satisfied their obligation to consider recovery by analyzing the effects of the proposed actions on the conservation of bull trout. See Cables, 509 F.3d at 1322 ("the review undeniably considered recovery by considering *conservation.*").

### iii.  Cumulative Effects

Federal agencies have no duty to consider cumulative effects during informal consultation. Conservation Congress v. U.S. Forest Serv., 720 F.3d 1048, 1055 (9th Cir. 2013). Nevertheless, the Forest Service elected to briefly address cumulative effects in the challenged BA. The BA identified multiple non-federal activities that will likely continue in riparian areas adjacent to critical habitat in the foreseeable future, including timber harvesting, road construction, culvert replacement, watershed restoration projects, invasive plant treatments, prescribed fires, recreation, and harvesting related to the bark beetle infestation. FWS 1447. It

acknowledged that these activities could adversely affect water quality — by increasing sediment and turbidity, removing streamside vegetation, and disturbing channels — but concluded such effects would be "localized and short term." FWS 1447.

Plaintiffs challenge the sufficiency of this analysis. They contend the Forest Service failed to fully analyze the impact of listed activities combined with public land grazing and overlooked important contributing factors, like climate change. When formulating a biological opinion, FWS must ask "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4). This requirement is not applicable in the informal context. "The contents of a biological assessment are at the discretion of the federal agency" and "*may* [include] ... consideration of cumulative effects[.]" 50 C.F.R. § 402.12(f) (emphasis added). Thus, the Forest Service had no obligation to consider cumulative effects at all, let alone in conjunction with the proposed action and climate change as Plaintiffs suggest. The Forest Service did not expose itself to scrutiny under heightened formal consultation standards merely by exercising its discretion to discuss cumulative effects in its BA. It was neither arbitrary nor capricious for the Forest Service to refrain from engaging in a more robust discussion of a topic "that it was not required to consider in the first place." Conservation Congress, 720 F.3d at 1056.

### C. Mitigation

Plaintiffs assert that Defendants erroneously relied on insufficient and speculative mitigation measures to support the 2011 BA's NLAA determination. The ESA prohibits biological opinions from relying on the mitigating effects of actions that are "not reasonably certain to occur." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 839 F.Supp.2d 1117,

1125 (D. Or. 2011). Mitigation measures must be "reasonably specific, certain to occur, and capable of implementation[.]" Ctr. for Biological Diversity v. Rumsfeld, 198 F.Supp.2d 1139, 1152 (D. Ariz. 2002). The 2011 BA does not violate or implicate this requirement. The challenged consultation was informal. It resulted in a BA and LOC, not a biological opinion. As such, the heightened standards of formal consultation do not apply. The Forest Service was merely obligated to articulate a satisfactory explanation for its NLAA finding, and rationally connect its conclusion to the BA's discretionary contents. 50 C.F.R. § 402.12(f); Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1193 (9th Cir. 2008). Plaintiffs suggest the agencies violated this standard by relying on mitigation measures set forth in the 2007 BA to support the NLAA conclusion without considering their effectiveness or enforceability. This is not an entirely accurate statement. The 2011 BA incorporated the 2007 BA's adaptive management approach and monitoring methods. FWS 1431, 1447-48. It did not, however, *rely* on those measures to support its NLAA finding. It did not present the 2007 measures as a cure for, or means of avoiding, a LAA conclusion. Indeed, the Forest Service did not identify any adverse effects warranting mitigation. It concluded that proposed grazing would have little to no effect on the newly designated critical habitat. FWS 1410. Irrespective of that decision, the Forest Service committed to flexibly manage the allotments and monitor for any changes in circumstances. FWS 1410. Because the 2011 BA's NLAA determination was not contingent on the implementation of the 2007 BA's monitoring or management measures, the Forest Service did not err by omitting analysis on them. The NLAA finding stands independent of the Forest Service's mitigation efforts.

/ / /

/ / /

### D. Alleged Inaccuracies

Finally, Plaintiffs allege a number of flaws in the 2011 consultation's analysis. First, they claim the BA overlooks or downplays impediments to bull trout recovery, including warming water temperatures and growing populations of rival species. This argument is easily dispelled. The BA explicitly acknowledges that "water temperatures above 15°C limit the occurrence of bull trout" and that "brown trout" are a competing species that must be "temporally and spatially isolated from bull trout." FWS 1428, 1434. While Plaintiffs disagree with the Forest Service's conclusion that grazing can continue despite these concerns, they have not demonstrated that the agency disregarded or irrationally analyzed them.

Second, Plaintiffs argue the BA omits data relevant to the condition of specific allotments. For example, Plaintiffs assert there is insufficient support for the BA's conclusion that grazing will not exacerbate sediment and water temperature issues for creeks within the Bear Lakes allotment. Pls.' Mot., at 21. The Court disagrees. The BA adequately explains that the streams are small and have a negligible influence on critical habitat. FWS 1436. It references stream surveys and photographs. FWS 1436. Though the Forest Service could have discussed monitoring data as Plaintiffs suggest, it was not required to do so. See 50 C.F.R. § 402.12(f) ("The contents of a biological assessment are at the discretion of the Federal agency[.]"). It is not the Court's role to choose which data or studies the Forest Service must consider, or to instruct the agency on "how to validate its hypotheses regarding wildlife viability[.]". The Lands Council v. McNair, 537 F.3d 981, 988 (9th Cir. 2008). Because the record indicates the Forest Service properly supported its findings for each allotment, the Court defers to the federal agency's "informed discretion" on these highly technical issues. Kleppe v. Sierra Club, 427 U.S. 390, 412

(1976); see also Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 377 (1989) (reviewing courts must be at their most deferential when examining scientific documents of this type).

Third, Plaintiffs assert the LOC contains inaccurate and insufficient information. The LOC notes that certain allotments' rugged topography minimizes cattle access. FWS 1462. Plaintiffs point out that portions of these allotments remain accessible. These two statements are not at odds. They are different ways of saying the same thing: topography limits grazing's effects in some, but not all, of the designated critical habitat. Similarly, the LOC's statement that pastures within the Paradise Creek allotment have intermittent hydrology does not contradict Plaintiffs' statement that others do not. FWS 1462. Plaintiffs complain that the LOC fails to consider monitoring data. As discussed in detail above, the Court does not find this omission to be arbitrary or capricious.

### E. Conclusion

Plaintiffs raise legitimate concerns about the future of Klamath River bull trout. The record shows their numbers and distribution are in steady decline. By designating miles of unoccupied habitat as critical, the FWS sent a clear message that more is needed to protect and recover the unique species. Klamath River bull trout are unlikely to survive, let alone thrive, if the status quo continues. However, the challenged interim consultation is not rendered invalid by these concerns. The 2011 BA and LOC focused on the narrow question of whether grazing would adversely affect bull trout's expanded critical habitat. Because the agencies reasonably answered this question in the negative, they had no obligation to delve into the deeper issues that Plaintiffs raise now.

/ / /

/ / /

## II.    Water Quality

Plaintiffs assert that the Forest Service violated the CWA and NFMA by authorizing grazing without ensuring compliance with water quality standards. They bring these claims pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

### A.  Clean Water Act

The CWA was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act imposes extensive requirements on "point sources" which it defines as "any discernible, confined, and discrete conveyance ... from which pollutants are or may be discharged" like a pipe, ditch, or machine. 33 U.S.C. § 1362(14). It leaves regulation of all other sources of water pollution, called "non-point sources," largely to the states. Oregon Nat. Desert Ass'n (ONDA) v. U.S. Forest Serv., 550 F.3d 778, 780 (9th Cir. 2008). In the present case, the parties do not dispute — and Ninth Circuit case law affirms — that "something as inherently mobile as a cow" constitutes a nonpoint source. Or. Natural Desert Ass'n v. Dombeck, 172 F.3d 1092, 1099 (9th Cir. 1998).

The CWA deals with non-point source pollution, in part, by requiring states to develop water quality standards for waterbodies within their jurisdiction, designating their specific uses and establishing criteria to protect those uses. 33 U.S.C. § 1313(c). In accordance with that requirement, the Oregon Department of Environmental Quality (DEQ) designed water temperature standards for streams supporting protected fish. OAR 340-041-0028.

The Fremont Forest Plan sets forth Best Management Practices (BMP) to ensure compliance with state water quality standards. POL 1883. In addition, the Forest Service operates under a Water Quality Restoration Plan (WQRP) which aims to maintain riparian areas in the Upper Klamath Basin so that every stream "is at its lowest potential temperature consistent

with ecological status and system potential." POL 3356. The Plan recognizes that it might take "several decades" to achieve that goal. POL 3367. DEQ and the Forest Service have committed to "work together to achieve compliance with all water quality standards." POL 5593. The agencies entered into Memorandums of Understanding (MOU) in 2003 and again in 2014 to document their joint strategy for managing water pollution. POL 5590, 6687. The MOUs track the Forest Plan's BMPs and the WQRP.

Plaintiffs contend the Forest Service's authorization of grazing in 2014 and 2015 on the Paradise Creek, Currier Camp, Withers Special Use, Bear Lakes, and Pothole allotments was arbitrary and capricious under the APA and violated Section 313 of the CWA, which provides:

> Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government ... engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants ... shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity ...

33 U.S.C. § 1323(a). Specifically, Plaintiffs argue the Forest Service ignored its Section 313 duties by permitting grazing that contributes to elevated water temperatures. It is not in dispute that multiple streams within the at-issue allotments exceed Oregon's temperature standards or that livestock aggravate the problem by trampling and widening channels, and eating vegetation that would otherwise provide shade. Regardless, the Forest Service contends that it is not subject to liability under the CWA because, among other things, (1) Congress has not waived sovereign immunity for suits like this one; (2) the Forest Service reasonably issued the AOIs in line with its BMP, WQRP, and MOUs; (3) the facts do not establish a causal relationship between temperature violations and authorized grazing; and (4) the state has sole authority to determine violations with its standards and has found none. Because the Court concludes that Plaintiffs'

CWA claim fails on the merits, it need not address the parties' arguments on the scope of sovereign immunity or Oregon's authority.

This Court confronted a claim very similar to Plaintiffs' in Ctr. For Biological Diversity v. Wagner, No. CIV. 08-302-CL, 2009 WL 2176049 (D. Or. June 29, 2009), report and recommendation adopted, No. CIV. 08-302-CL, 2009 WL 2208023 (D. Or. July 22, 2009). There, environmental groups alleged grazing authorized by the Forest Service resulted in exceedances of Oregon's *E. coli* standards and thereby violated the CWA. Id. at *14-16. At the time, state regulations provided that any designated management agency that implemented BMPs would be deemed compliant with water quality standards. Id. at *17 (citing OAR 340-041-0061(13)). Because the Forest Service was a designated management agency that had implemented BMPs, this Court found no violation of state or federal water quality law despite evidence of elevated bacteria levels. Id. at *18.

Sometime between Wagner and the present action, Oregon DEQ removed the regulatory provision equating agencies' implementation of BMPs to compliance. Due to this revision, Plaintiffs argue the Forest Service can no longer rely on its BMPs and, instead, must "strictly comply" with state water quality standards. The Court disagrees. By deleting the provision, DEQ merely eliminated agencies' ability to *automatically* qualify as compliant by implementing BMPs. It did not prohibit agencies from utilizing BMPs to comply with water quality standards on a case-by-case basis.[2] Here, DEQ has certified that the Forest Service's WQRP "contains the elements necessary to address" its responsibilities and, therefore, that the federal agency "is in

---

[2] Plaintiffs mistakenly assert that the holding in Nw. Envtl. Advocates v. U.S. E.P.A. prohibits any reliance on BMPs. 855 F.Supp.2d 1199, 1209 (D. Or. 2012). There, Judge Acosta held the EPA was required to review Oregon's now-removed BMP regulation because it was "so bound up with Oregon's water quality standards" that it could undermine their application. Id. at 1212. The opinion focused on EPA's duty to review state water quality regulations. It did not foreclose DEQ or the Forest Service from using non-numeric proxies, like BMPs, to assess compliance with water quality standards as Plaintiffs suggest. Nor did it require EPA to review all state decisions involving BMPs.

compliance with the [state's] requirements" so long as it implements the plan's approved restoration goals and protective measures. SECOND SUPP POL 42. In doing so, DEQ recognized violations may occur while the Forest Service works to achieve long-term goals. It noted "some time will be required for the actions identified in the WQRP to realize full water quality benefits," but found these actions will eventually "result in improved water quality and better overall environmental conditions." SECOND SUPP POL 42. Though Plaintiffs speculate that the Forest Service has not fully implemented its BMPs, there is no evidence that the agency has failed to undertake any specific commitment or otherwise acted in bad faith.

On this record, the Court cannot say that the Forest Service has ignored its Section 313 duties. It designed and implemented multiple measures to ensure achievement of temperature standards. DEQ has approved of those efforts and certified their compliance with state regulations. Exceedances are expected and do not render the Forest Service's efforts invalid. The Forest Service rationally issued the challenged AOIs on this basis. See Cables, 509 F.3d at 1333 ("[S]o long as BMPs have been implemented, the state agency has no authority to take enforcement action, and the Forest Service cannot be said to have failed to comply with state requirements 'in the same manner, and to the same extent as any nongovernmental entity.'").

### B. National Forest Management Act

The National Forest Management Act (NFMA) requires the Forest Service to develop and maintain a comprehensive Land and Resource Management Plan (Forest Plan) for each national forest. 16 U.S.C. § 1604(a). A forest plan is "a broad, long-term planning document ... [that] establishes goals and objectives for management of forest resources." Earth Island Inst. v. U.S. Forest Serv., 697 F.3d 1010, 1014 (9th Cir. 2012). Once a forest plan is adopted, all subsequent agency actions must comply with it. 16 U.S.C. § 1604(i). The Forest Service's

"interpretation and implementation of its own forest plan is entitled to substantial deference." Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1056 (9th Cir. 2012).

The Fremont Forest Plan requires compliance with state water quality standards. POL 1926. In addition, it includes an Inland Native Fish Strategy (INFISH) aimed at achieving desired conditions for bull trout habitat. POL 2669-83. In pertinent part, INFISH sets forth Riparian Management Objectives (RMO) for the improvement of important habitat features including bank stability and water temperature.

Plaintiffs assert the 2014 and 2015 AOIs violate NFMA by contributing to violations of INFISH's water temperature RMO and state standards. As discussed in detail above, Plaintiffs have not demonstrated that the AOIs violate Oregon's water quality regulations. Plaintiffs cite to evidence of warming water in multiple streams to establish a violation of the INFISH temperature RMO. This is insufficient for two reasons. First, Plaintiffs fail to demonstrate that permitted grazing is responsible for noted exceedances. Second, Plaintiffs' narrow and rigid application of the RMOs departs from the strategy's text. INFISH contemplates that its objectives are "targets" that will not be met instantaneously. POL 2670-71. It instructs the Forest Service to take a holistic approach to RMOs. If one objective is met or exceeded, "there may be some latitude in assessing the importance of the objectives for other features that contribute to good habitat conditions." POL 2671. The attainment of RMOs is to be assessed on a watershed level. POL 2671. In light of INFISH's flexible approach and in the absence of evidence that the complained-of temperatures constitute "landscape-scale" problems that are not mitigated by other long-term efforts, the Court cannot conclude that the challenged AOIs violate INFISH's temperature RMO or, by extension, NFMA. The Forest Service reasonably gathered and

evaluated data relevant to INFISH, and issued the 2014 and 2015 AOIs on that basis. POL 6704-16; SUPP POL 1481. Its decision to authorize grazing was neither arbitrary nor capricious.

**III.   River Values**

Finally, Plaintiffs contend that the Forest Service's issuance of AOIs violated the WSRA and NFMA. As a threshold issue, Defendants question the propriety of Plaintiffs' focus on AOIs. The Forest Service uses AOIs to implement its previously authorized grazing decisions. Because Plaintiffs did not timely challenge those underlying agency decisions, Defendants argue their current claim is precluded. Otherwise, Defendants suggest Plaintiffs could use AOIs as "a never-ending hook to belatedly challenge their environmental concerns with long-standing land management decisions." Defs.' Mot., at 52. The Court understands Defendants' pragmatic concerns but, nevertheless, finds the challenged AOIs to be final agency actions subject to judicial review under the APA. Oregon Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 990 (9th Cir. 2006). The AOIs represent "the Forest Service's last word" on annual grazing allowances and impose binding obligations on permit holders. Id. The fact that they draw from other agency actions does not lessen their legal force or reviewability.

A.  Wild and Scenic Rivers Act

Congress enacted the Wild and Scenic Rivers Act (WSRA) in 1968 to identify, preserve, and protect certain rivers that "possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values[.]" 16 U.S.C. § 1271. To achieve this end, the WSRA requires agencies to manage a designated river "in such a manner as to protect and enhance the values which caused it to be [designated] without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of

these values." 16 U.S.C. § 1281(a). "[P]rimary emphasis" is to be given to protecting designated rivers' "esthetic, scenic, historic, archeologic, and scientific features." Id.

In 1988, Congress designated a segment of the Sycan River as "scenic" under the WSRA. 16 U.S.C. § 1274(a)(103). In compliance with the WSRA, the Forest Service adopted the Sycan Wild and Scenic River Management Plan, which it incorporated into the Fremont and Winema National Forest Plans. SUPP POL 1-7. The plan sets forth goals and standards for the protection and enhancement of the river's outstandingly remarkable values (ORV) which include geology, scenery, fisheries, and wildlife. SUPP POL 5.

Plaintiffs assert grazing is incompatible with the WSRA's mandate to "protect and enhance" the Upper Sycan's ORV. 16 U.S.C. § 1281(a) (emphasis added). They contend the Forest Service violated the WSRA by authorizing grazing in allotments within the river corridor in 2014 and 2015. It is undisputed that grazing adversely affects riparian conditions, and by extension, disturbs fisheries. SUPP POL 23, 1428. Plaintiffs' members have submitted reports to the Forest Service complaining that their scenic enjoyment of the corridor is reduced by cattle, cow pies, trampled stream banks, and stripped vegetation.  SUPP POL 14960-62. More, however, is needed to establish a WSRA violation. The WSRA's "protect and enhance" requirement does not stand alone. The provision goes on to instruct agencies to manage designated rivers "without, insofar as is consistent [with the values motivating designation of the river], limiting other uses that do not *substantially interfere* with public use and enjoyment of these values." 16 U.S.C. § 1281(a) (emphasis added). Thus, the Act contemplates the continuation of uses that interfere with the public use and enjoyment of a river's ORV. It recognizes that an agency can protect and enhance river values while simultaneously permitting uses that do not serve those goals. For example, in Hells Canyon Alliance v. U.S. Forest Service,

Page 24 – ORDER

environmental plaintiffs challenged the Forest Service's decision to allow motorized boats on the wild and scenic Snake River. 227 F.3d 1170, 1178 (9th Cir. 2000), as amended (Nov. 29, 2000). Although boats indisputably reduced the river's scenic value, the Ninth Circuit concluded that they did not substantially interfere with its ORV. Id. ("the mere existence of some decline in scenic value does not establish that motorized use substantially interferes with this value"). Similarly, here, evidence of disturbed fisheries and scenic values does not "lead inexorably to the conclusion" that the Forest Service has violated the WSRA by permitting livestock on the river corridor. Id. at 1177.

In this case, the Forest Service rationally considered grazing's potentially adverse effects on the river corridor. The challenged AOIs were issued on a record showing grazing is a historic use that does not substantially interfere with the scenic Upper Sycan's river values. In 1992, the Forest Service engaged in a public process to determine whether it should eliminate grazing within the corridor. SUPP POL 5. It recognized that grazing negatively affects fish and their habitat but, nevertheless, concluded that it could continue "when consistent with other resource values." SUPP POL 7, 23. In 2004, the Forest Service conducted a detailed environmental assessment focused on grazing. SUPP POL 4820-5051. Again, it acknowledged grazing's potential to degrade vegetation, bank stability, and channel quality. SUPP POL 4839. However, it concluded that grazing within certain parameters was compatible with its WSRA obligations. SUPP POL 4980. While Plaintiffs plainly disagree with the Forest Service's conclusions, they have not carried the burden of showing that they are arbitrary or capricious. The Court defers to the Forest Services' reasoned judgment on the proper balance of competing uses for the river corridor. Norton v. S. Utah Wilderness All., 542 U.S. 55, 58 (2004) (the Forest Service is charged with the "enormously complicated task of striking a balance among the many competing

uses to which land can be put[.]"); Hells Canyon, 227 F.3d at 1178 (the agency's "decisions with respect to what uses are inconsistent with protection and enhancement and 'substantially interfere' with the river corridor's values must be accorded substantial deference[.]").

### B. National Forest Management Act

Relatedly, Plaintiffs argue the 2014 and 2015 AOIs deviate from the Forest Plan's River Plan and, therefore, violate NFMA's mandate that all agency actions comply with the governing Forest Plan. Plaintiffs allege four inconsistencies between the plan and AOIs. First, they contend the Forest Service failed to review the AOIs and their underlying AMPs for compliance with the plan's directives. The River Plan requires the Forest Service to "review allotment operating plans or allotment management plans for compliance with" its standards, guidelines, and goals. POL 2361. It does not mention AOIs and, therefore, the Forest Service reasonably refrained from analyzing plan compliance in the challenged annual documents. In arguing that relevant AMPs violate the review requirement — either because no AMP is in existence or because it contains inadequate analysis — Plaintiffs overlook an important caveat. The River Plan explicitly notes that agency budgeting and funding will control when the Forest Service can implement proposed management actions. POL 2360. It does not demand that the Forest Service accomplish the review requirement immediately. Second, Plaintiffs list purported violations of the plan's fisheries standards and guidelines. These guidelines are "designed to meet the long-term [defined as more than 20 years] desired condition for fisheries. POL 2357. They use the word "should" rather than "shall," suggesting that they are not mandatory in all cases. POL 2358. Plaintiffs present evidence that stream temperatures, width/depth ratios, and habitat deviate from the guidelines. However, they have not connected those violations to the challenged AOIs or any other agency action. As such, the Court cannot conclude that authorized grazing is to blame.

Third, Plaintiffs assert grazing is destabilizing streambanks in violation of the plan's requirement that "no increase over natural levels of streambank degradation (existing at the time of Wild and Scenic designation) shall be caused by, or perpetrated by, livestock." POL 2352. There is insufficient evidence to support this conclusion. Specifically, Plaintiffs have not demonstrated that streambanks in the allotments are degraded beyond their level at the time of designation, or that grazing is the cause. Fourth, Plaintiffs contend authorized grazing violates the plan's commitment to maintain the diversity of vegetation. While it is not in dispute that grazing adversely affects vegetation, more is needed to show a violation. The plan merely requires the Forest Service to *minimize*, not terminate, management actions that reduce the diversity of plant life. POL 2353. In sum, the 2014 and 2015 AOIs were neither legally erroneous nor contrary to the River Plan. Therefore, the Court defers to the Forest Service and grants summary judgment in its favor.

## ORDER

For the reasons stated above, Defendants' and Defendant-Intervenors' motions (#58, #59, #60) are GRANTED and Plaintiffs' motion (#45) is DENIED.

It is so ORDERED and DATED this _____ day of June 2016.

MARK D. CLARKE
United States Magistrate Judge